OTIS STEEL CO., Limited, v. LOCAL UNION NO. 218, OF CLEVELAND, OHIO, OF IRON MOLDERS' UNION OF NORTH AMERICA et al.

(Circuit Court, N. D. Ohio, E. D. July 9, 1901.)

No. 6,220.

1. INJUNCTION—LABOR STRIKE—UNLAWFUL INTERFERENCE WITH EMPLOYER'S BUSINESS.

The law governing courts requires them to exercise strict care, in the issuance of injunctions, to respect and protect the legal rights of those against whom they are directed; and by analogy, and for stronger reason, the law will not countenance the action of members of a labor organization, who are on a strike, against their employer, in assuming to issue and enforce an edict that such employer shall not be permitted to operate his plant, and that nonunion men shall not be allowed to enter his employment. Such action is, in effect, the issuance by a self-constituted tribunal of an injunction unknown to any recognized law, and which no court would have authority to grant; and it is the clear right and duty of a court, on proper application therefor, to prevent by injunction the attempted enforcement of such an order by the use of force or a show of force.

2. SAME—MAINTENANCE OF PICKETS—INTIMIDATION OF WORKMEN.

A labor union, whose members are on a strike, has no lawful right to maintain an organized force of pickets around the works of the former employer for the purpose of preventing by force the operation of such works, or of intimidating nonunion men, and preventing them from entering or leaving such works by a show of force; and the fact that for months, during all of which time such pickets have been maintained, the nonunion workmen employed in the plant have either remained in the works or left and returned to them only under the protection of guards is evidence that intimidation, if not actual force, has been employed, and that such is the purpose of maintaining the picket; and a court of equity is authorized to enjoin its further maintenance as an unlawful interference with the rights of both employer and workmen.

In Equity.

Squire, Sanders & Dempsey, for complainant.

Foran, McTighe & Baker, for defendants.

WING, District Judge (orally). It will be unnecessary, at this time, to go over all of the recitals and allegations of the bill. It contains charges that the defendants, Local Union No. 218 of the Iron Molders' Union of North America, and certain individuals named as defendants, who are said to be members of that union, and others whose names are not known, have attempted by various means, including the establishment and maintenance of "pickets," to interfere with the operation of the complainant's mill, and with its employment of men disapproved by the defendants, and it is also alleged that violence and riotous acts have accompanied these attempts. The answer denies that any violence has been committed by the defendants, and sets up as a defense, at considerable length, a history of what is called the "old strike," which commenced in July, 1900, and alleges that some agreement of settlement of that strike was made, and that such agreement of settlement was broken by the complainant, and that a new strike was instituted about April 1st of this year. Affidavits are filed by the com-

plainant, in which are described instances of violence of recent dates—one occurring on the 6th of April—in the neighborhood of the complainant's plant, and several of the defendants are named as having been engaged in these disturbances. It is also stated in the affidavits that violence has been perpetrated by some of the defendants upon some of the molders now employed by the complainant, and upon their guardians, or special policemen, hired to protect them. Some acts of violence are described in these affidavits as occurring as recently as the 21st of May last, and certain individual defendants are named as having been engaged therein. It is also alleged in these affidavits that threats have been made by unknown people at a boarding house at which some of the employés of the complainant lived. Counsel for the defendants have correctly stated that, so far as any individuals have been named as having been engaged in these acts of violence and riot, such individuals, with the exception of two, have filed affidavits that they know nothing of the doings described, and that they are not guilty of the offenses charged. Whatever the truth may be upon the disputed question as to whether actual violence was indulged in by the defendants, or some of them, it appears from affidavits filed by the defendants, and it is practically an agreed fact in this case, that "picketing," so called, has been employed, as a means of carrying out its purposes, by the defendant association, during all of the first strike, or what is called the "old strike," as also during the second strike, which has been in existence since April 1st; and that such picketing was suspended for some weeks, during the time when it was supposed an agreement had been arrived at between the striking molders and their employer. Counsel for the defendants have gone into a somewhat lengthy history of the writ of injunction, with a view of impressing upon the court the great care that should be exercised by the courts in the use of the writ as a remedy. It is peculiarly appropriate, in the analysis of these strike cases, to consider the great power which the jurisdiction to issue this writ confers, and the strict boundaries which should confine its use, because the beginning of all this trouble was the attempt of the Iron Molders' Union, No. 218, without the assistance of a court, to enjoin the complainant from operating its plant. That injunction was attempted to be enforced, not only against the complainant, but against all nonunion molders; and its terms, as addressed to the complainant, were, in substance, "You must not proceed with your business and the operation of your plant unless you comply with the conditions which we have imposed;" and, as to the nonunion molders, "You shall not work for the Otis Steel Company." It would not be claimed for a moment that there has ever existed any authority in the defendant to so issue its edicts against either the complainant or the nonunion molders. The assumed right to thus dictate to others may be referred to an unfounded notion on the part of this molders' union that it and its members are the exponents of some higher law than that which may be administered by courts. It would not be urged for a moment that this molders' union, or its members, could have rightfully obtained from any court the injunc-

tion against the Otis Steel Company and the nonunion molders, which, in the course of this strike, has been attempted to be enforced. If, from the history of the writ of injunction, it can be gathered that courts should exercise great care in its use, it follows with more force that a self-constituted body of men, deriving no authority from recognized law, should not be permitted to originate edicts for the government of others, and attempt to enforce them by any means whatsoever.

Now, what are the means, in analogy to contempt proceedings, by which this self-constituted court has attempted to enforce its injunction? The one admitted thing is the establishment and maintenance of a system of picketing. Whether this picketing has been accompanied with violence or not we need not consider. It certainly was one of the means used by this defendant organization to enforce its mandate. While picketing may not be an occasion of war, it certainly is an evidence that war exists, and the term is appropriately borrowed from the nomenclature of actual warfare. This system, constantly kept up, in its nature leads to disturbance, and has a tendency to intimidate. That it is used by the defendants as a means of enforcing their unauthorized mandate, and that it accompanies the utterance of it, is an admission by the defendants that it will prove effective in enforcing such mandate. It is therefore a violation of the rights of this complainant, and of all nonunion men, or of any and all men who choose to work in disobedience to the orders of this defendant union. Behind all law there is necessarily force. The orders and judgments of courts would otherwise be futile. Behind the order made by this union is the tacit threat of enforcement by appropriate means. One of the actual means used, and admitted, has been the constant and regular attendance of pickets about the plant of the complainant, with short intermission, for a period of a year. It has been said in decided cases a sufficient number of times to dispense with this repetition, and it is known to every one, whether he belongs to a union or not, or who has had under consideration any of these contests between employer and employé, and their effect upon social life, that it lies at the bottom of every idea of just government that each man has a right to use his life and his ability to labor undisturbed by any interference whatsoever, so long as he does not, in the exercise of that right, disturb the right of any other man to do the same thing. There are at the foundation of all labor organizations, as there are at the foundation of religious organizations, and all the innumerable other forms of social organizations, certain ideas peculiar to each; and there is an undoubted right in the members of such organizations to promulgate their theories by reason, logic, argument, and the persuasive influence of those peaceful weapons, to the end that other men may be brought to think as they do. When that persuasion has been accomplished, the men persuaded may evidence such fact by joining the organization whose principles and theories they have come to believe. These unions have a perfect right, whether they are sound in their beliefs or not, to believe as they do; and the members thereof would be the last to admit that any other body of men had a right to com-

mand and coerce them into the observance of other beliefs. They have, as I have stated, a perfect right to entertain these beliefs, and to promulgate them; but they must not attempt to force them upon any one else by physical demonstrations. It is certainly true that this system of picketing, although it may not have been accompanied by violence on the part of those who have served as pickets, has and will do injury. It appears from affidavits filed that the complainant employs 500 or 600 men, 50 or 60 of whom are molders; that it pays to these molders extraordinary wages in the way of bonuses, these bonuses varying from three to five dollars per day; that it has hired men to accompany the few molders who have left the works while going to and from their homes; and that opportunities to sleep within the works have also been furnished, so that the men engaged as molders, with few exceptions, have stayed within the works, day and night, for a period of at least six months. All the employés of the complainant, other than molders, have gone to and from their homes in the usual way, apparently uninfluenced by any fear of injury. I cannot imagine a company resorting to these extraordinary expenses and pains without there was some cause; nor can I imagine the individual molders submitting to be thus confined unless intimidation of some sort had influenced them. This state of things is evidence of a higher character, in deciding the issue as to whether or not picketing tends to intimidate those against whom it is directed, than the statements in affidavits filed by the individual defendants to the effect that no means of intimidation have been used.

It is admitted that this system of picketing has existed at the instance of the defendants. It is, in a way, admitted that picketing is a means of enforcing the edicts of the defendant union, because it has been used in connection therewith. It goes without saying that this means would not have been used unless it were thought to be effective in some way. The only way in which it could be effective would be to produce in the minds of the nonunion men who have been employed against the wishes and orders of the union a feeling of fear that the menacing eye of this numerous organized body of men composing the union was upon them for some purpose not friendly; that watch was being kept to learn not only who came out, but when they might come out; that such espionage meant that the pickets were present for the purpose of waiting until some one should come out. The absence of violence may be explained by the fact that the nonunion molders did not come out of these works except at rare intervals, and then usually in considerable numbers. In this case there is proof of injury and interruption to the business of the complainant by the acts of the defendants, and it is not a departure from the line of decided cases to grant the injunction prayed for. No harm can result to the defendants by the granting of the injunction, except that they will be deprived of what they apparently conceive to be their right to enforce the unauthorized injunction which they themselves have issued. It has been said in an eloquent and learned decision that it cannot too soon be learned, and learned thoroughly, that, under this government at least, freedom

of action, so long as a man does not interfere with the rights of others, will be protected and maintained; and that it is unlawful for any man to dictate to another what his conduct shall be, and to attempt to enforce such dictation by any form of undue pressure. Nor must intimidation be disguised in the assumed character of persuasion. Persuasion, too emphatic or too long and persistently continued, may itself become a nuisance, and its use a form of unlawful coercion. The injunction will be allowed, substantially as prayed for.

I am asked by counsel for the defendants just what is meant by "picketing." I think these defendants know what "picketing" means, as they have inaugurated it. It is the establishment and maintenance of an organized espionage upon the works, and upon those going to and from them.