[No. 3142.]

# MILO HOADLEY *v.* THE CITY AND COUNTY OF SAN FRANCISCO.

DEDICATION OF PUBLIC SQUARES TO PUBLIC USE. —An act of the Legislature, ratifying and confirming a void ordinance of a municipality providing for laying out public squares on pueblo lands within its limits, and a void order made by the municipal authorities adopting a plan, survey, and map of such public squares, reported by commissioners appointed for that purpose, operates as a selection and dedication of the squares to public use, and no other or further acceptance by the public is needed in order to make the dedication complete.

LIMITATION OF ACTIONS AS TO PUEBLO LANDS.—The Statute of Limitations as to the pueblo lands in the city of San Francisco did not commence to run until the passage of the act of Congress of July 1, 1864, granting and relinquishing the title to the city.

USE OF PUBLIC SQUARES IN A CITY.—If squares in a city are dedicated to public use, the use does not vest in the city, nor in the inhabitants, but in the public.

EFFECT OF ACQUISITION OF TITLE TO LANDS DEDICATED TO PUBLIC USE.— If a city lays out and dedicates public squares on the pueblo lands within its limits, and the dedication is ratified by an act of the Legislature, and Congress afterwards relinquishes to the city the title of the United States to the lands, for the uses and purposes mentioned in the ratifying act, the act of Congress confirms the dedication, and makes it operative upon the legal title, as well as upon such title as the city held prior to the act of Congress.

STATUTE OF LIMITATIONS AS TO PUBLIC SQUARES AND ROADS.—If lands have been possessed for such a length of time as will, under the operation of the Statute of Limitations, extinguish the title held by a private person, or a municipality, such adverse possession will not also extinguish a public use of the land to which it has been dedicated, such as the right of the public to use it for a road, or a public square.

IDEM.—If the title to land is granted to a city in trust for the use of the public, private persons cannot acquire the right to it by an adverse possession for the period prescribed in the Statute of Limitations.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The two parcels of land in controversy in this action are thus described:

First. Commencing at the point of intersection of the northern line of Clay street with the eastern line of Scott street, running thence northerly along the last-named line two hundred and seventy-five (275) feet, more or less, to the north line or boundary of the "Hoadley Claim;" running thence in a line due east along the north line of the "Hoadley Claim" to its intersection with the western line of Pierce street; thence southwardly along the western line of Pierce street, two hundred feet, more or less, to the northern line of Clay street; thence westerly, along the last-named line, four hundred and twelve and one-half (412½) feet, more or less, to the place of beginning.

Second. Commencing at the point of intersection of the southern line of Post street with the eastern line of Scott street, running thence southwardly along the last-named line two hundred and seventy-five (275) feet to the northern line of Geary street; thence eastwardly along the last-named line four hundred and twelve and one-half (412½) feet to the western line of Pierce street; thence northwardly along the last-named line two hundred and seventy-five feet to the southern line of Post street; thence westwardly, along the last-named line, four hundred and twelve and one-half (412½) feet to the place of beginning.

When California was acquired from Mexico, it was understood that, by the law of Mexico, the pueblo then existing on the site of the present city of San Francisco owned the land there to the extent of four square leagues. The Legislature having this fact in view incorporated said city, and it became the successor to the rights and property of said pueblo.

Accordingly, in 1852, the city presented a petition to the United States Land Commission for a confirmation of its claim to the four square leagues of land.

The land in said city east of Larkin and Johnston streets had been mostly granted by the town Alcaldes to residents, or otherwise disposed of by the city. But to the land west of Larkin street and southwest of Johnston (now Ninth)

street, no title had been attempted to be given to the persons in possession until June, 1855, when Ordinance No. 822 was passed by the Common Council of San Francisco, the purpose of which ordinance was to grant and relinquish to the actual settlers thereon, all title and claim of said city to said land, reserving streets, and also reserving the right, within six months from the passage of said ordinance, to select therefrom engine-house lots, school-house lots, and public squares—the latter to be of only one block in size, and not more than one-twentieth of the land in possession of any one possessor was to be taken for the purpose without compensation therefor. The selections were to be made by three commissioners to be chosen by the Common Council, and the commissioners were to report their selections to the Common Council for approval.

In September, 1855, another ordinance, No. 845, was passed, fixing the time to elect the commissioners, and providing that the city surveyor, acting with them, should furnish, by way of recommendation, to the Common Council, within one month from the date of their appointment, a plan for the location and dimensions of streets through the land granted; upon which plan should also be designated the lots and blocks selected by said commission for school-houses, engine-houses and squares.

Said last ordinance, No. 845, also reordained, ratified and confirmed the prior ordinance, No. 822, in all its parts. Ordinance No. 822 was signed by Webb, Mayor, while Ordinance No. 845 was signed by Van Ness, Mayor.

November 12, 1855, the three commissioners were appointed. They made no report until April 19, 1856, four months after the time specified in Ordinance No. 822 (the Webb Ordinance), and more than six months after the passage of Ordinance No. 845 (the Van Ness Ordinance proper). The plan so reported was never adopted by the Common Council.

In the Board of Assistant Aldermen, April 21, 1856, the report was received, read and ordered published, and laid over for further consideration. Subsequently, the plan was referred to a joint committee of the Common Council, who

made their report May 12, 1856, accompanying the same with the draft of an ordinance to legalize said plan, and recommending the adoption of said proposed ordinance, and that the city surveyor be instructed to report to the Common Council the names proposed for the different streets, etc., to be confirmed, or others adopted in their place, before they were officially placed on the map.

The names were placed upon the map by the surveyor, and the same subsequently reported for approval; but no further action was taken upon the subject by either branch of the Common Council, and the government of the city was shortly after abolished.

In July, 1856, the governments of the city and of the county of San Francisco, were united in one corporation, thereafter and now known as the City and County of San Francisco. The justices of the peace of said former county were constituted an *ad interim* board of supervisors of said city and county. These justices of the peace, acting as a board of supervisors of the city and county of San Francisco, passed an order October 16, 1856, adopting the plan or map reported by the Commission and made by the surveyor of the late city, and declared it to be the plan of the city of San Francisco in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes in that portion of the incorporated limits of the former city lying west of Larkin and southwest of Johnston streets.

March 11, 1858, the State Legislature passed an act reciting the passage of Ordinances Nos. 822 and 845, and the order above referred to of the justices of the peace, acting as supervisors, and ratified and confirmed all of them.

July 1, 1864, Congress passed an act (12 U. S. Stat. at Large, p. 333, Sec. 4), relinquishing and granting to the city of San Francisco, and its successors, all the right and title of the United States to the land within the corporate limits of the charter of 1851, for the uses and purposes specified in the above-mentioned ordinances, excepting therefrom the government reservations and property in the then use and occupation of the General Government.

In May, 1865, the Circuit Court of the United States confirmed the claim of the city of San Francisco to the pueblo lands, four square leagues—the confirmation being stated to be in trust for the benefit of the lot-holders under grants from the pueblo, town, or city of San Francisco, etc., which decree was confirmed by act of Congress, March 8, 1866.

All the above-recited acts, ordinances, and decree, included the land to which plaintiff seeks to quiet his title.

The court rendered judgment in favor of the plaintiff and the defendant appealed.

The other facts are stated in the opinion.

*W. C. Burnett*, for the Appellant.

There was a pueblo of San Francisco, and the city of San Francisco, as successor thereto, was entitled to, and had confirmation of four square leagues of land, including the premises in controversy. (*Hart* v. *Burnett*, 15 Cal. 530.)

The confirmation was made of such lands in trust for the use of its inhabitants for all time, subject only to alienation by such agents and in such mode as prescribed by law. (*Hart* v. *Burnett*, 15 Cal. 583.) And the city of San Francisco has only such power of disposition of such lands as is given by statute. (*Payne et al.* v. *Treadwell*, 16 Cal. 220.)

The lands described in the complaint were excepted, reserved, and dedicated to public use as parts of public squares, by virtue of "An Act concerning the City of San Francisco, and to ratify and confirm certain ordinances of the Common Council of said city," approved March 11, 1858. (Stat. of 1858, 52.)

The title to the four square leagues was in the United States at the time of the passage of the Van Ness Ordinance, and the United States, by virtue of "An Act to expedite the settlement of titles to lands in the State of California," approved July 1, 1864, "relinquished and granted" all the right and title of the United States to the lands within the corporate limits as defined by the act of 1851, "to the said city and its successors, for the uses and purposes specified in the ordinances of said city, ratified by an act of the Legislature of the said State, approved on the

11th of March, 1858, entitled 'An Act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the Common Council of said city.'" The uses and purposes therein referred to are to be found by considering all of said ordinances and said act of the Legislature as a whole. The premises are parts of public squares, and, in their character as such public squares, the people of the State of California are entitled to their occupation, and to freely pass and repass thereon (as upon public streets). All citizens have an easement in a public square. (*Anderson et al.* v. *The Rochester R. R. Co.*, 9 How. Prac. R. 553.) And therefore, respondent's possession is the possession of the public, and the statute will not run.

The occupation by respondent of a public square, with fences or other obstructions, is a public nuisance. No length of time will legalize a public nuisance. (*Folkes* v. *Chad. et al.*, 3 Douglas R. 340–3; *Vought* v. *Winch*, 2 Barn. and Ald. 662, 671; *The King* v. *Montague*, 6 G. 4; 4 Barn. & C. 598, 602, 605.)

As matter of law, the Statute of Limitations had not, on January 5, 1870, power to aid respondent in the perfection of a title.

Public rights are not destroyed by long-continued encroachments, or permissive trespasses. (*Kittanning Academy* v. *Brown*, 41 Penn. State R. 269; *Commonwealth* v. *McDonald*, 16 S. and R. 394; *Barter* v. *Commonwealth*, 3 Penn. Rep. 257; *Rung* v. *Shoenberger*, 2 Watts, 23; *Lane* v. *Kennedy*, 13 Ohio (N. S.) 42.)

*S. W. Holladay and S. L. Lupton,* for the Respondent.

The confirmation of the Van Ness Ordinance by the Legislature, in 1858, gave it effect the same as if the authority to pass it had originally existed in the Common Council. Ratification relates back, and is equivalent to prior authority; so that, for the present purposes, the ordinance is to be construed as if, in all repects, originally valid. (*Hart* v. *Burnett*, 15 Cal. 610; *McCracken* v. *City of San Francisco*, 16 Cal. 591; *Branham* v. *Mayor of San Jose*, 24 Cal. 605; *Seabury* v. *Arthur*, 28 Cal. 143–151; Story on Agency, 235–239.)

The Statute of Limitations runs against the city as well as against any other litigant. (*San Francisco* v. *Calderwood*, 31 Cal. 588.) And the statute applies to the land in controversy as well as to any other land. (*Mayor of San Jose* v. *Trimble*, 41 Cal. 536; *Sabichi* v. *Aguilar*, 43 Cal. 285; *Arrington* v. *Liscom*, 34 Cal. 365, 380–381; *Cannon* v. *Stockman*, 36 Cal. 380; *Cahill* v. *Palmer*, 45 N. Y. 434; *Armstrong* v. *Dalton*, 14 Dev. N. C. 599; *County St. Charles* v. *Powell*, 22 Mo. 528; *Payne* v. *Commissioners*, Wright, Ohio Rep. 417; *Lessees of Cincinnati* v. *First Presbyterian Church*, 8 Ohio Rep. 310.)

The Legislature may not only ratify void ordinances, but, when ratified, the ordinance operates as if valid when passed.

In Dillon on Mun. Corp., Section 352, we find this proposition sustained in the following language: "The Legislature may ratify ordinances not otherwise binding, and offenders should thereafter be prosecuted under the ordinances, and not under the validating act;" citing in footnote *Truchelut* v. *City Council*, 1 Nott & McC. (S. C.) 227.

Ratification is equivalent to previous authority. It operates upon the ordinance in the same manner as though the authority to make the contract had existed originally. (*Field* v. *Seabury*, 19 How. 323; *Seabury* v. *Arthur*, 28 Cal. 143–151.)

*John B. Felton and Theodore H. Hittell*, also for the Respondent.

By the Court, RHODES, J.:

This action was brought to quiet the title of the plaintiff to two pieces of land, one of which forms a part of Alta Plaza, and the other a part of Hamilton Square, as laid down on the maps of the city. The plaintiff claims title under the Van Ness Ordinance and the confirmatory act of March 11, 1858 (Stats. 1858, p. 52), and the act of Congress of July 1, 1864, by which the title of the United States was relinquished and granted to the city for the uses and purposes specified in the act of March 11, 1858, and he also

claims title by adverse possession. The defense is that the plaintiff did not acquire the Van Ness Ordinance title; that the squares were dedicated as public squares, and that the Statute of Limitations had not run at the time of the commencement of the action, so as to bar the rights secured by the dedication of the squares to public use, or affect the title held by the city.

The proofs show that the plaintiff was in the actual possession of the premises on the 1st day of January, 1855, and so continued up to and after the 20th day of June, 1855; and that the title vested in him under the Van Ness Ordinance and the confirmatory acts, unless the squares were selected and dedicated as public squares. The sixth section of the ordinance provides that the city may lay out and reserve upon the lands west of Larkin street and southwest of Johnston street "public squares, which shall not embrace more than one block, corresponding in size to the adjoining blocks; provided that the selection shall be made within six months from the time of the passage of this ordinance," and that not more than one-twentieth of the land in the possession of any person shall be taken for that purpose without due compensation. The clause of the proviso last mentioned may be dismissed from consideration, as the evidence does not show that more than one-twentieth of the lands of the plaintiff's grantor were taken for the purposes mentioned in that section. Ordinance No. 845, approved September 27, 1855, provided for the election of commissioners to discharge the duties specified in Ordinance No. 822 (the Van Ness Ordinance), and directed the commissioners and the city surveyor to furnish, within a month from the date of their appointment, a plan for the location of the streets and the lots and grounds selected under the Van Ness Ordinance. The act of March 11, 1858, recites that commissioners were appointed in pursuance of the aforesaid ordinances, and that they, together with the city surveyor, agreed upon and reported for the approval of the Common Council "a plan for the location of streets, public squares and lots for public uses, to be laid out west of Larkin and southwest of Johnston street, in said city, accompanied by

a map of the same, which said plan and map was by the justices of the peace, exercising the powers of a board of supervisors of the city and county of San Francisco, adopted, approved and ratified by an order bearing date the sixteenth day of October, A. D. one thousand eight hundred and fifty-six." The order adopted the plan or map reported by the commissioners, and declared it to be "the plan of the city in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes" in that portion of the city lying west of Larkin and southwest of Johnston streets. The act of March 11, 1858, ratified and confirmed the ordinances and the order above mentioned.

It is contended that the order of the justices of the peace was void, on the ground that they could not be invested by the Legislature with power to perform duties of that character; but it is unnecessary to determine that question, for, conceding it to have been void, the question to be determined is, what was the effect of the act of March 11, 1858, in ratifying the ordinances and the order, all of which were void at the time of their adoption; that is to say, void so far as they attempt to convey titles to private persons, and to select and dedicate to public use the squares involved in this case? The act of March 11, 1858, ratifying and confirming the ordinance and order there recited, operated, as we construe it, as a selection and dedication to public use of the squares in controversy, and no other further acceptance by the public, than was afforded by the act, was needed in order to make the dedication complete. It results from this construction of the act, that the plaintiff did not acquire any title to the squares under the operation of the act and the ordinances thereby ratified and confirmed.

The only remaining points we shall notice relate to the Statute of Limitations. The adverse possession commenced in 1853 or 1854; but under the authority of *Gardner* v. *Miller* (47 Cal. 570), it must be held that the statute commenced to run in this case upon the passage of the act of Congress of July 1, 1864, granting and relinquishing the title of the United States to the city. The action was com-

menced in 1870. The evidence, it may be assumed, was suffi-
cient to show that the possession was adverse within the
statutory definition, if the statute is applicable to the prop-
erty in controversy.

The question will be considered in two aspects: 1st, as it
relates to the use acquired by the dedication; and, 2d, as
to the legal title vested in the city by virtue of the act of
Congress of July 1, 1864.

1. When the squares were dedicated in the mode already
stated, they were dedicated to public use; and this use did
not vest in the city, nor in the inhabitants of the city, but
in the public. It requires, I think, no argument to prove
this proposition. In this respect it stands like the streets
of a city or the highways in a county. (2 Dillon Mun.
Corp., Sec. 520, and cases there cited.) The duty, how-·
ever, of regulating, improving and protecting the squares,
is imposed on the city by the statute providing for the city
government. The act of Congress of July 1, 1864, did not
destroy, or in any respect impair the dedication; but, on the
contrary, by granting and relinquishing the title of the United
States to the city, for the uses and purposes mentioned in
the act of March 11, 1858, it ratified and confirmed the dedi-
cation, and made it operative upon the legal title as well as
such title as the city held prior to the act of July 1, 1864,
and thus virtually perfected the dedication.

It may be urged that in view of the fact that the squares
were dedicated to public use, the question of the effect
thereupon of adverse possession, does not arise in the case.
But it is apparent that that is the most important question
in controversy, the determination of which is sought and
desired by the parties. The arguments of the counsel of
both parties point to that, as the vital question in the case;
and it becomes important to the city, in view of its duty in
respect to the squares, to have a determination of the ques-
tion. If the dedication is extinguished, the city has no
right to enter to make improvements or protect the prop-
erty for public use. When lands have been held adversely
under such circumstances and for such a period, that the
title held by a private person, or by a municipality, or by

the State as a private proprietor, would be extinguished under the operation of the Statute of Limitations, will such adverse possession also extinguish a public use if the lands have been dedicated to that purpose—will it also bar the rights which the public gained by the dedication? We are of the opinion that the question must be answered in the negative. The Statute of Limitations was not intended as a bar to the assertion by the public of rights of that character. There are many authorities opposed to this view, but there are others which sustain it, among which are *Commonwealth* v. *Alberger,* 1 Whart. 486; *Rung* v. *Shoenberger,* 2 Watts, 23; *Commonwealth* v. *McDonald,* 16 Serg. & R. 395; *Baxter* v: *Commonwealth,* 3 Pa. 253; *Penny Pot Landing Case,* 16 Pa. St. 94; *Jersey City* v. *Morris Canal Co.,* 1 Beas. (N. J.) 227; *Jersey City* v. *State,* 1 Vroom, 521. Those cases are, in our opinion, sustainable on principle, and, in our judgment, lay down the better rule on this question.

2. The legal title to the squares, as already stated, vested in the city by the operation of the act of Congress of July 1, 1864. Admitting it to be true, that ordinarily the statute of five years is applicable in respect to lands to which the city holds the title, as was decided in this Court in *Calderwood* v. *San Francisco* (31 Cal. 588), is that statute applicable in this case? Was the legal title which the city held extinguished by the adverse possession of the plaintiff for a period of five years after the passage of the act of Congress of July 1, 1864? The title which the United States held in the land, and which was transferred to the city by the act of Congress, was so transferred to the city in trust, for the purposes expressed in the statute of March 11, 1858, above referred to, and for no other purpose. That is to say, the title was granted to the city in trust, for public use; and the city had no authority, by virtue either of the statute of March 11, 1858, or of the act of Congress of July 1, 1864, to alienate or in any manner dispose of it, but only to hold it for the purposes expressed in the statute. It was granted to the city for public use, and is held for that purpose only. It cannot be conveyed to private persons, and is effectually withdrawn from commerce; and the city hav-

ing no authority to convey the title, private persons are vir-
tually precluded from acquiring it. The land itself, and
not the use only, was dedicated to the public. Land held
for that purpose, whether held by the State or a municipal-
ity, in our opinion, is not subject to the operation of the
Statute of Limitations.

Judgment and order reversed and cause remanded for a
new trial.