[S. F. No. 4066. In Bank.—September 19, 1910.]

EMMA L. MERRITT et al., Executors of the Will of Adolph Sutro, Deceased, Respondents, v. C. J. BARTA et al., Appellants.

SAN FRANCISCO—MAP OF OUTSIDE LANDS.—JUDICIAL NOTICE.—The so-called "Map of Outside Lands," in the city of San Francisco, made under the authority of the act of March 27, 1868, and which was expressly ratified and recognized as an official map by the act of March 14, 1870, (Stats. 1870, p. 353), providing for the execution of deeds to persons who had had previous possession of the lots delineated thereon, will be taken judicial notice of as a public document prepared and promulgated by the state.

ID.—LAND BETWEEN FORTY-NINTH AVENUE AND GREAT HIGHWAY NOT DEDICATED TO PUBLIC USE.—It was not the effect of the Map of Outside Lands, or of the survey and proceedings leading up to it,

to dedicate to public use, either as a part of Forty-ninth Avenue, or as a part of the Great Highway, the strip of land in the form of a triangle lying west of the street designated on said map as Forty-ninth Avenue, and east of the street fronting on the Pacific Ocean and designated thereon as the "Great Highway."

ID.—EFFECT OF HUMPHREY'S MAP—DIVISION OF LAND INTO CITY BLOCKS.—This conclusion is strengthened by the fact, that subsequently, in 1870, the board of supervisors of the city of San Francisco, acting in further pursuance of the authority conferred on them by the act of March 27, 1868, caused a new and amended map to be made, known as the "Humphrey's Map," on which the west line of Forty-ninth Avenue was delineated at a distance of seventy feet from its east line, and the triangular piece of land between such avenue and the "Great Highway" was subdivided into blocks of the same length north and south as the other blocks shown on the map.

ID.—EFFECT OF DEED FROM CITY—RECITALS OF COMPLIANCE WITH CONDITIONS.—A deed by the city, for a portion of such triangular piece of land, executed in pursuance of the act of March 14, 1870, and reciting a compliance with the conditions imposed by that act, implies that the board of supervisors had determined that the land had not been dedicated to public use, but was the property of the grantee, under the provisions of the act of March 27, 1868. As the lot was not reserved for public use, but was mere proprietary lands of the city, the deed would be conclusive upon the city as a transfer of its title, under the provisions of the act of March 14, 1870, even if the applicant was not in possession at the passage of the act of Congress of March 8, 1866.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. M. C. Sloss, Judge.

The facts are stated in the opinion of the court.

Jas. F. Tevlin, Percy V. Long, City Attorney, and Adolphus E. Graupner, for Appellants.

J. C. McKinstry, for Respondents.

P. F. Dunne, for Hotaling Estate Co.

SHAW, J.—The complaint states a cause of action to recover possession of land alleged to belong to the estate of Adolph Sutro, deceased, and to quiet title thereto. The defendants answered, denying the title of the plaintiffs' testator. They also filed a cross-complaint averring the execution by Adolph Sutro in his lifetime of a contract to sell the

land to one Drummond, to whose rights defendants have suc-
ceeded, and asking specific performance thereof. Issue was
joined on the cross-complaint, and the court proceeded first
to the trial of these issues without a jury, and, after hearing
the evidence of the defendants in support thereof, granted
a nonsuit thereon in favor of the plaintiffs and a judgment
of nonsuit was entered accordingly. Thereafter, the issues
formed by the complaint and the answer of the defendants
thereto were tried by a jury and the appeals are taken from
the judgment thereon given against the defendants and from
an order denying their motion for a new trial of those issues.
The proceedings on the cross-complaint, the evidence taken
in support thereof, and the judgment thereon are not pre-
sented for review. Under these circumstances the cross-
complaint and the proceedings thereon are entirely excluded
from our consideration. The case must be decided precisely
as it would be if no cross-complaint had been filed.

The alleged contract of Sutro and the defendants was not
pleaded as an estoppel against the defendants and hence,
although it was set up in the cross-complaint, it is not before
us for consideration and we cannot determine whether or not
the defendants would have been thereby estopped to deny the
plaintiffs' title.

The land in controversy is a small lot in the form of a
trapezium situated in the city of San Francisco, and alleged
to be bounded north by I Street, east by Forty-ninth Avenue,
south by J Street and west by the street known as the "Great
Highway," fronting on the Pacific Ocean. It constitutes a
part of what are known as "outside lands." Under the act
of April 15, 1851 (Stats. 1851, p. 357), the southern boundary
of the city was a line parallel with Clay Street located two
and a half miles south of the center of Portsmouth Square,
and the western boundary was parallel with Kearny Street
and two miles west of the center of Portsmouth Square. These
"outside lands" were the lands situated west and south of the
above-mentioned boundaries. Soon after its organization the
city of San Francisco laid claim to these and other lands as
successor to the Mexican pueblo, and began proceedings for
the confirmation of its title by the United States. Prior to this
proceeding, and also while it was pending, many parcels of
the land were sold by the city and pueblo to private persons

who took possession under the purchases. When the lands were confirmed to the city by the final decree of the United States circuit court, in 1865, that court, for the protection of the persons holding these parcels of land, inserted in the decree a clause declaring that the title of the city should be held in trust for the benefit of the lot-holders under grant from the pueblo, town or city of San Francisco. (*Cal. Academy of Sciences* v. *San Francisco,* 107 Cal. 338, [40 Pac. 427].) For the further confirmation of title to the city and the lot-holders, Congress passed the act of March 8, 1866, granting the lands known as the "Pueblo Lands" to the city upon the trust that, as to any parcel in the *bona fide* actual possession of any person at the time of the passage of the act, the city should convey the same to such person or his successors, "except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses," and that, as to any residue of the land, it should be held "in trust for the use and benefit of the inhabitants of the city." (See *Baker* v. *Brickell,* 87 Cal. 333; *Cal. Academy of Sciences* v. *San Francisco,* 107 Cal. 338, [40 Pac. 427]; *Home for Inebriates* v. *San Francisco,* 119 Cal. 534, [51 Pac. 950].)

On January 14, 1868, a city ordinance known as "Order No. 800" was passed. At that time the city limits had been extended so as to include these "outside lands." This ordinance provided that a plan should be adopted for the subdivision of these lands into lots and blocks showing the streets, public highways, parks, and other portions set apart for public use and that, when adopted, a map thereof should be made and that the said parts so set apart and designated on said map as streets, highways, parks, etc., "shall be deemed absolutely dedicated as such." The ordinance was adopted as a statute by the legislature by the act of March 27, 1868, and all proceedings under it then or thereafter had were thereby expressly declared to be ratified and affirmed. (Stats. 1867-1868, p. 379.) Section 9 of this statute provided that the land lying south of a line drawn east from Seal Rock and "west of a line easterly not less than two hundred feet from ordinary high-water mark, is hereby reserved and set apart for public use as a public highway." The map made in pursuance of this statute is known as the "Map of Outside Lands."

It is claimed by the appellants that, by virtue of the survey

made under this statute and the aforesaid map thereof, the lands here involved were included in one of the streets of the city, designated thereon as "Forty Ninth Avenue," that they were thereby set apart and reserved for public use, and that they still remain of that character. It was shown by the plaintiffs that on October 18, 1877, a deed of conveyance was executed by the city to one Paul Rousset, purporting to convey to him the tract in controversy, and that Rousset had afterwards conveyed the same to the plaintiffs' testator, Adolph Sutro. If this deed to Rousset was valid and effectual to transfer the title to the lot, the defendants are without right thereto, and the plaintiffs properly prevailed in the suit. If, at the time that deed was made in 1877, the lot still remained a part of a public street of the city, dedicated by virtue of the act of the legislature as Forty-ninth Avenue, the city had no power to alienate it and the plaintiffs' title would fail. The defendant, C. J. Barta, being in possession, he would, in that case, have the right to a judgment in his favor allowing him to retain the possession as against the plaintiffs, although not against the city. The question is thus presented whether or not this land was in fact reserved for public use as a street by the survey and map of "outside lands" and if so, whether or not it remained dedicated to public use at the time of the execution of the city deed in 1877.

At the time of the first hearing and decision of this case in this court, we did not have access to the "Map of Outside Lands," or to any copy thereof. The record was burned in the great fire of 1906, and we have only a restored copy. The transcript gives a mere diagram which does not purport to be a copy of that part of the map, or of any map, and it delineates only the part of Forty-ninth Avenue which includes the lot in controversy. The Map of Outside Lands was made under the authority of the statute of 1868 aforesaid and it was expressly ratified and recognized as an official map by the act of March 14, 1870 (Stats. 1869-1870, p. 353), providing for the execution of deeds to persons who had had previous possession of the lots delineated thereon, being the act under which the deed to Rousset was made. The court will therefore take judicial notice of the map as a public document prepared and promulgated by the state. (*Diggins* v. *Hartshorne,* 108 Cal. 158, [41 Pac. 283].)

After the first decision of this case a rehearing was granted. Upon further consideration upon that hearing, a resubmission was ordered and the parties were requested to file additional briefs upon the question whether or not the effect of the Map of Outside Lands and the survey and proceedings leading up to it was to dedicate the block in question as a part of Forty-ninth Avenue. The brief thereupon filed on behalf of the appellant contains extracts from the proceedings of the board of supervisors and from the report of the committee accompanying the Map of Outside Lands. It is claimed that these tend to show such dedication. Other extracts are given in the brief for the respondent to show the contrary. We have examined these extracts and also a copy of the Map of Outside Lands. We are satisfied therefrom that the land comprising the lot herein claimed by the plaintiffs was not reserved or set apart for public use by that map, either as a part of Forty-ninth Avenue, or as a part of the Great Highway. The map shows forty-eight streets running north and south, designated as avenues, numbered from one on the east to forty-eight on the west, and intersected by streets running east and west designated by the letters of the alphabet. The avenues appear to be of the uniform width of seventy feet. The intervening blocks are all numbered. Immediately west of Forty-eighth Avenue a tier of blocks is laid off and numbered, corresponding with the others in all respects. Along the space immediately west of this tier of blocks, in the same relative position as the names of the other avenues, and in capital letters of the same style and size, are written the words "FORTY NINTH AVENUE," occupying, as do the others, a space equal to the width of an avenue. There is, however, no line for the western boundary of Forty-ninth Avenue. The triangular space between the west line of the blocks and the line marked as the east line of the Great Highway is blank, except for the words denoting Forty-ninth Avenue. From a line extended due east from Seal Rock, running southerly from said line and parallel with the ocean front, at a distance indicated by the scale as two hundred feet east of high-water mark, a red line is drawn, and along this two-hundred-foot strip is written a statement that the land between the "red line" and the ocean is reserved as a "Great Highway." This line is not parallel with the lines of the above-mentioned avenues and blocks to the east thereof.

The east and west street next south of the park is marked
"H" Street and the next streets, southerly, as "I" and "J"
streets, respectively. The west line of the said westerly tier
of blocks intersects the red line at a point between O and P
streets, five blocks south of J Street. From that point north,
the west line of these blocks diverges easterly from the line
of the Great Highway, so that at a point opposite Seal Rock
the west line of the blocks is something more than three hun-
dred feet east of the red line drawn as the easterly boundary
of the Great Highway. This wedge-shaped tract is not laid
off into blocks and no streets are delineated as crossing it.
It is not marked in any way, except by the words "FORTY
NINTH AVENUE," very close to the line of the blocks, as
aforesaid. If this strip or wedge was intended to be set apart
as a street, the curious and absurd result would be two streets
adjoining each other, running in the same direction; that is,
the Great Highway, two hundred feet wide, and a wedge-
shaped street, immediately adjoining it on the east, some
three hundred feet wide at the north end and tapering to
a point one and a half miles to the south, where its eastern
line would enter the Great Highway. An inspection of the
map convinces us that there was no such intention, and that,
on the contrary, the irregular-shaped tract was purposely
left unsurveyed, or at least without subdivision into blocks,
and that the purpose of entering therein the words "Forty
Ninth Avenue" was to indicate that an avenue of the same
width as the others was to be subsequently laid off, imme-
diately west of the western tier of blocks, when the irregular
tract should be thereafter actually subdivided.

Assuming that we may judicially notice and consider the
record of the proceedings of the board and the report of the
committee which the board adopted, which are not in the
transcript, we find nothing in them to establish an intention
to dedicate the wedge-shaped strip lying between the last tier
of blocks and the Great Highway as a public street. There
are some expressions therein which indicate an opposite in-
tention. The report of the committee recommended "that
when the land will admit of a right angled survey of blocks,"
the blocks should be laid out six hundred feet northerly and
southerly and two hundred and forty feet easterly and west-
erly, and that the east and west streets should be eighty feet

wide and the north and south streets seventy feet wide. Nothing is said concerning the wedge-shaped strip lying next to the Great Highway, or concerning any street of irregular width. This is clearly inconsistent with the idea that there was to be an irregular street over three hundred feet wide at the north end and tapering to a point at the south end. It is claimed that the insertion of the words "Forty Ninth Avenue" along the extreme eastern verge of this tract necessarily shows that the entire strip should be an irregular street. This is contrary to the declaration, adopted in the report, that the north and south streets were to be seventy feet wide. There is no explanation of the laying out of such an irregular street as this would make, nor of the remarkable fact that it aligns the Great Highway. These declarations, in connection with the map, make it much more reasonable to conclude that the strip was left unplatted and that the words "Forty Ninth Avenue," which occupy the exact space of a street seventy feet wide, were put along the eastern edge of the strip, next to the western tier of blocks, to show that there was to be an avenue of that number, and of the same width as the others, abutting the western line of that tier of blocks.

Another consideration fortifies this conclusion. If the map does not show that the strip was purposely left as land not subdivided, it is at least ambiguous upon the question of its character. The act of March 27, 1868, adopting "Order No. 800," was not self-executing. It contemplated and required the subsequent adoption of a plan of subdivision of these outside lands and a survey and subdivision thereof according to such plan. The board was made the agent of the state to accomplish these things. No time was fixed within which it must be done. There was no declaration that the first attempt at subdivision was to be final and conclusive in all respects, or that errors in the map could not be corrected, or that the whole of the lands should be included in the first survey and map, or that if a part of it was not subdivided by the first survey and map, the work could not be completed by a subsequent survey and map, covering the uncompleted tracts. If this part of the tract was not subdivided by the survey and map resulting in the Map of Outside Lands, the board retained power to complete it and if the map made was ambiguous, the board had power to clear up the uncer-

tainty by a new or amended map. In 1870 another map, known as the "Humphrey's Map," was made by the board, which, if the "Map of Outside Lands" is to be taken as ambiguous or incomplete, was, in effect, a correction or completion thereof, in respect of this strip. It is also in the nature of an interpretation by conduct, and it indicates that it was then understood that the previous survey and map were not complete. This Humphrey's Map shows a line drawn as the west line of Forty-ninth Avenue, making it seventy feet wide, in conformity with the other avenues, and from this western line of that avenue all the east and west streets are marked

thereon as extending into this wedge-shaped strip toward the Great Highway, thus indicating a subdivision of the strip into blocks of the same length north and south as the other blocks. The part of the strip which is here involved is exhibited thereon as a block bounded by the streets as heretofore stated. Evidently one of the purposes intended to be served by the making of this Humphrey's Map was to extend the subdivision into this strip and to show the width of Forty-ninth Avenue. The accompanying diagrams show the wedge-shaped strip and adjoining blocks as delineated on the Map of Outside Lands and the Humphrey's Map, respectively, and illustrate what has been said on the subject:—

The act of March 14, 1870, under which the Rousset deed was made, provided for a petition and a hearing upon the question whether or not the lands for which a deed was sought had been set apart for public use by the survey and map made in pursuance of "Order No. 800" embodied in the statute of March 27, 1868, aforesaid, and for an adjudication that it was not so dedicated, before a deed could be made for the land. If it were so adjudicated, and the other conditions prescribed had been complied with and found to exist, the board of supervisors were directed to order the execution of a deed, and thereupon the mayor was directed to execute a deed in the name of the city to the applicant for the land awarded to him. The execution of the deed to Rousset, and the recitals contained therein, imply that the board of supervisors determined that the land had not been dedicated to public use, but was the property of Rousset, under the provisions of the act of 1868 aforesaid. And as the lot was not reserved for public use, but was mere proprietary lands of the city, the deed would be conclusive upon the city as a transfer of its title, under the provisions of the act of March 14, 1870, even if the applicant was not in possession at the passage of the act of Congress of March 8, 1866.

It follows that the title of the plaintiffs is shown to be valid and that as the defendants have nothing but the naked possession, they must yield to the holder of the legal title. Having reached this conclusion upon these grounds, the question to which the original briefs are chiefly directed, whether the Humphrey's Map is valid, whether it operated to vacate dedications to public use which appeared to have been made

by the Outside Lands Map and whether the Humphrey's Map was authorized, or has been recognized or ratified by the legislature, are all immaterial to the decision of the case and need not be considered.

The judgment and order are affirmed.

Melvin, J., Henshaw, J., and Lorigan, J., concurred.

BEATTY, C. J.—I concur in the judgment and in the opinion of Justice Shaw, and desire only to suggest a consideration, not therein adverted to, which, in my opinion, fortifies the conclusion that the broad space between the Great Highway and the east line of Forty-ninth Avenue never was irrevocably or absolutely dedicated as a street of San Francisco, and there is no claim that it was ever dedicated or reserved for any other public purpose. It was not within the power of the supervisors to make a dedication of any part of the "outside lands" in violation of the trust upon which they were committed to their disposal. The grant of those lands to the city was upon a trust for the benefit of those in *bona fide* possession on March 8, 1866, and the city was administering that trust under the authority and subject to the restrictions of the act of March 27, 1868, confirming Order 800, which contained these qualifying words (Stats. 1867-1878, p. 383): "No person in actual possession of any of the lands mentioned in the first section of said order on the said eighth day of March, eighteen hundred and sixty-six, and on which five years taxes shall have been paid, as provided in such order, shall be dispossessed of any of said lands under any order heretofore or hereafter made by said board of supervisors for the reservation of any of said lands for public uses, except for streets, until compensation shall have been actually made to such person, as provided in said order Number Eight Hundred; and until such compensation shall have been made such persons shall be allowed to continue in possession of such lands so possessed by them." Not only is the ratification of the order subject to this express qualification, but the ratification itself extends only to what is done in conformity to the order, and both the order and the confirmatory statute are so far subject to the trust which they assume to execute that the plan to be adopted for the subdivision of the outside

lands into lots and blocks in pursuance of the first section of Order 800 was subject to the inherent condition that it must be reasonable and equitable in its relation to the beneficiaries of the trust, and that when adopted it should be impartially followed out in its application to the holdings of those in possession of the lands. Such a plan was adopted. It provided for reservations of large tracts for park and cemetery and for smaller reservations for other purposes, for all of which the persons dispossessed were to be compensated. It provided also for the Great Highway and for the subdivision of the unreserved portion of the outside lands into blocks divided by north and south streets seventy feet wide, and east and west streets eighty feet wide; the blocks were to be rectangular and two hundred and forty by six hundred feet in dimensions where they could be so surveyed, but in irregular spaces like that between the diverging lines of Forty-ninth Avenue and the Great Highway there is the clearest implication that fractional blocks should still be laid out as large as the regular execution of the plan would leave them, or in other words, that a *bona fide* occupant of such irregular spaces should not be wholly dispossessed of his holding without compensation merely because, after laying off the streets in regular and impartial execution of a fair and equitable plan, he would have left a block smaller than the full block. The plan required him to give up so much of his land as fell within the streets running at right angles and seventy and eighty feet wide. It did not require him to give up more, and his rights as a beneficiary of the trust forbade such an arbitrary departure from the plan as would compel him to do so.

As this case is presented on the record we must assume that the lands between high tide and the east line of Forty-ninth Avenue and including the demanded premises were in the *bona fide* occupation of Rousset or his grantors on March 8, 1866. If so the board of supervisors violated their trust in approving a map which attempted to dedicate as a street more of his land than the plan of subdivision called for, and whether this was done purposely or by mistake, it was not only their right but their duty to rectify the wrong. This they appear to have done by the subsequent adoption of the Humphrey's Map, and the conveyance of the lot; and this

fact—that they only did in the end what it was their para-
mount duty to do in the beginning—that they merely trans-
ferred to the person rightfully entitled that to which the city
never had a valid claim, distinguishes this case from *Hoadly*
v. *San Francisco,* 50 Cal. 265, and all other cases depending
on the principle that property dedicated to a public use is
inalienable.

Angellotti, J., concurred.

SHAW, J.—I concur in the foregoing views of the Chief
Justice.