[No. S031721. July 31, 1995.]

PLANNED PARENTHOOD SHASTA-DIABLO, INC., Plaintiff and
Respondent, v.
CHRISTINE WILLIAMS et al., Defendants and Appellants.

**COUNSEL**

John R. Streett for Defendants and Appellants.

James Joseph Lynch, Jr., Jay Alan Sekulow, Walter M. Weber, Thomas P. Monaghan, Christopher R. Inama and Craig Peter T. S. Cornell as Amici Curiae on behalf of Defendants and Appellants.

McCutchen, Doyle, Brown & Enersen, Maria P. Rivera, Geoffrey L. Robinson, Grant Guerra and Stephen Kostka for Plaintiff and Respondent.

Catherine I. Hanson, Alice P. Mead, Celeste Lacy Davis, Morrison & Foerster, James J. Garrett, Gregory P. Dresser, Elizabeth Bader, Jill Schlictmann, Melanie Wyne and Elizabeth Dahl as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.**—In *Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1994) 7 Cal.4th 860 [30 Cal.Rptr.2d 629, 873 P.2d 1224] (*Planned Parenthood I*), this court upheld an injunction limiting the protest activities of petitioners, anti-abortion activists, to the sidewalk across the street from a women's health clinic operated by Planned Parenthood, Shasta-Diablo, Inc.

(Planned Parenthood). Thereafter, the United States Supreme Court announced its decision in *Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516] (*Madsen*), which upheld, under a slightly stricter constitutional standard than we applied in *Planned Parenthood I*, an injunction creating a buffer zone of 36 feet around a women's health clinic, thereby effectively restricting the anti-abortion protesters in that case to the other side of the street from the clinic. (512 U.S. at p. __ [129 L.Ed.2d at pp. 609-611, 114 S.Ct. at pp. 2526-2527].)

Petitioners herein petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court granted certioriari, vacated our earlier judgment, and remanded the cause to this court "for further consideration in light of" *Madsen.* ((1994) __ U.S. __ [130 L.Ed.2d 329, 115 S.Ct. 413].) We requested and received supplemental briefing from the parties addressed to this topic. Having now reconsidered the matter, we are persuaded that the injunction we upheld in *Planned Parenthood I, supra,* 7 Cal.4th 860, is equally valid under the new standard set forth in *Madsen.* We therefore reaffirm the judgment in favor of Planned Parenthood.

I.

The facts are set forth in full in *Planned Parenthood I, supra,* 7 Cal.4th 860, and will be repeated here only insofar as they are relevant to the remand.

Planned Parenthood operates a family planning clinic in Vallejo. The clinic provides a range of family planning and health services, including abortions. The clinic is located in a one-story building. The entrance to the clinic is on the side of the building adjacent to a parking lot. There is a concrete yard for additional parking immediately in the front of the building, and a narrow public sidewalk between the yard and the street. The sidewalk is punctuated by two driveways into the parking lot. (*Planned Parenthood I, supra,* 7 Cal.4th at p. 865.)

Beginning in March 1990, petitioners began gathering at the clinic, primarily on Thursdays when abortions were performed, to picket and demonstrate against abortions. Although their numbers varied, there were usually six to eight demonstrators at any given time, and occasionally as many as one hundred. Petitioners picketed on the public sidewalk in front of the clinic as well as in the parking lot. One of the tactics of the sidewalk picketers was to walk slowly across the driveway entrance, thereby delaying cars attempting to turn into the parking lot from the street. Demonstrators would then approach the car and attempt to pass literature through the

windows. Other protesters pursued patients walking from their cars to the clinic entrance, as well as along the sidewalk and across the street to the bus stop, offering "sidewalk counseling." Such "counseling" consisted of pressing anti-abortion literature and plastic replicas of fetuses on patients attempting to enter the clinic and exhorting them to reconsider their decision to have an abortion. Petitioners also stationed several sidewalk "counselors" directly outside the clinic entrance for the same purpose. (*Planned Parenthood I*, *supra*, 7 Cal.4th at pp. 865-866.) A witness for petitioners testified that picketing on the sidewalk in front of the clinic was impractical because the sidewalk crossed both driveways; thus, even a few picketers "would impede traffic on Broadway, being a busy street, [and] would probably cause traffic accidents."

In response to Planned Parenthood's complaint for injunctive relief, the trial court initially issued in August 1990 a temporary restraining order enjoining petitioners from harassing any person entering or leaving the building and limiting their picketing to the sidewalk in front of the building. Following a hearing in September, the court granted a preliminary injunction limiting to four the number of pickets that petitioners could maintain on the sidewalk and restricting their proximity to one another. Trial on the complaint for a permanent injunction was held in April 1992. Testimony was received from Janice Schoenfeld, the escort coordinator for the clinic, who stated that the demonstrators had generally complied with the preliminary injunction "except for picketers." Marsha Anderson, the clinic director, testified that she had been forced to call the police to enforce the preliminary injunction, " 'to hand it out to people who were on the sidewalk and were about to break the rules,' " or breaking the rules. (*Planned Parenthood I*, *supra*, 7 Cal.4th at pp. 866-867, fn. 2.) The clinic was compelled to employ "escorts" to help patients enter and leave the clinic without being physically accosted by demonstrators.

Following trial, the court made findings that petitioners had (1) confronted and intimidated women seeking the clinic's services and forced plastic replicas of fetuses and "counseling" upon the clinic's patients and staff; (2) interfered with or obstructed entrance to and exit from the clinic; (3) pursued patients to their cars and public transportation to distribute literature and plastic fetuses; and (4) caused some of the women seeking medical services to become emotionally distraught. Based on these findings, the trial court granted a permanent injunction against petitioners. Among other provisions, the injunction restricted their picketing, demonstrating and counseling activities to the public sidewalk across the street from the clinic. (*Planned Parenthood I*, *supra*, 7 Cal.4th at pp. 866-867.)

Although the Court of Appeal invalidated certain other provisions of the injunction, it sustained the place restriction, concluding that it served a substantial governmental interest in safeguarding a woman's fundamental right to procreative choice under article I, section 1, of the California Constitution, and was narrowly tailored to serve that end. (*Planned Parenthood I, supra*, 7 Cal.4th at pp. 867-868.)

We granted review and affirmed the judgment of the Court of Appeal, but on slightly different grounds. We applied what was then the settled four-part test to determine the constitutional validity of a time, place, and manner restriction limiting such speech activities as picketing and leafleting in a public forum. (See *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746]; *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [82 L.Ed.2d 221, 226-227, 104 S.Ct. 3065].) Under that standard, the first issue to be determined is whether the restriction is content neutral, that is, whether it regulates "without reference to the content of the regulated speech." (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 771 [48 L.Ed.2d 346, 364, 96 S.Ct. 1817].) We concluded that the place restriction was content neutral, observing that it made no reference to petitioners' viewpoint, but focused exclusively on the location and manner of their protest activities. (*Planned Parenthood I, supra*, 7 Cal.4th at pp. 869-871.) Petitioners' contention that the injunction was content based because it was impelled by, and directed exclusively against, their anti-abortion activities was similarly rejected. As we explained, the injunction was properly confined to petitioners as "they were the only ones found to have harassed clinic patients and staff." (*Id.* at p. 870.) It was not their point of view, but their harassing and confrontational conduct that impelled the restriction. "Indeed, a similar injunction might just as readily apply to pro-choice demonstrators or to any other disruptive protest in close . . . proximity to the clinic." (*Id.* at p. 871.)

We next considered whether the restriction served a significant governmental interest, and concluded that the buffer zone was amply justified by the significant state interest in preserving the health and safety of patients entering and leaving a medical facility for purposes of receiving treatment, including clinical abortions. As we observed, "the government 'may properly assert *important interests in safeguarding health*' and 'in maintaining medical standards' in the performance of abortions. [Citation.] The state has a 'legitimate interest in seeing to it that an abortion, like any other medical procedure, is performed under circumstances that *insure maximum safety for the patient.*' " (*Planned Parenthood I, supra*, 7 Cal.4th at p. 873, quoting *Roe* v. *Wade* (1973) 410 U.S. 113, 150 [35 L.Ed.2d 147, 175, 93 S.Ct. 705], italics added.)

In this regard, we noted the substantial line of authority approving the imposition of reasonable buffer zones around family planning clinics to prevent health-threatening physical confrontations with, and intimidation of, patients entering and leaving the facilities. (*Planned Parenthood I, supra*, 7 Cal.4th at pp. 874-875, 877.) The record and the trial court's findings plainly indicated that this was one of the primary purposes of the place restriction, "to constrain petitioners' confrontational tactics and thereby limit the physical intimidation of, and resulting emotional trauma to, the clinic's patients." (*Id.* at p. 875.)

We next examined the injunction to determine whether it was sufficiently narrowly tailored to achieve the expressed governmental interests. We concluded that the buffer zone was necessary to ameliorate the health and safety threat posed by petitioners' aggressive, confrontational tactics, and that lesser means, such as limiting the number of protesters on the sidewalk, would not have accomplished this end. "[T]he state's interest in protecting the patients required the preclusion of face-to-face, physical confrontations with the protesters." (*Planned Parenthood I, supra*, 7 Cal.4th at p. 879, fn. 10.)

Finally, we concluded that the injunction left petitioners adequate alternative avenues of communication, observing that the site across the street afforded them a vantage from which to picket and leaflet that was "reasonably close to the clinic and, judging from the photographic exhibits in the record, within plain view of their target audience, the clinic patients and staff." (*Planned Parenthood I, supra*, 7 Cal.4th at p. 880-881.) Nothing indicated that their signs would not be clearly visible or that their presence and views would not be readily perceived by persons entering and leaving the clinic. (*Ibid.*)

We thus held that the buffer zone satisfied all of the relevant constitutional criteria, and affirmed the judgment of the Court of Appeal.

## II.

To reconsider our decision in light of *Madsen*, as directed by the high court, necessarily requires a review of the court's opinion in that case in some detail.

In *Madsen*, the respondent, an abortion clinic located on a public street called "Dixie Way" in Melbourne, Florida, sought and obtained an injunction against the petitioners, anti-abortion protesters who had picketed and demonstrated outside the clinic. The initial injunction permanently enjoined

petitioners from blocking or interfering with access to the clinic or from physically abusing persons entering or leaving the clinic. Six months later, the trial court issued a broader injunction in response to respondent's allegations that "access to the clinic [for some women] was still impeded by petitioners' activities and that such activities . . . had deleterious physical effects on others." (*Madsen, supra,* 512 U.S. __ [129 L.Ed.2d at p. 603, 114 S.Ct. at p. 2521].) The number of protesters outside the clinic varied from day to day, ranging from a handful to 400. (*Ibid.*) The evidence showed, and the trial court found, that as traffic attempted to turn from Dixie Way into the clinic, protesters would force them to slow and attempt to pass anti-abortion literature to the occupants; that patients and staff would be followed in a stalking manner, giving such persons a feeling of great apprehension; and that "as a result of having to run such a gauntlet to enter the clinic, the patients 'manifested a higher level of anxiety and hypertension . . . .'" (*Ibid.*; see *Operation Rescue* v. *Women's Health Center* (Fla. 1993) 626 So.2d 664, 667-669 [setting forth the full text of the trial court's findings].)

This and other evidence led the state trial court to conclude that its original injunction was insufficient to "'protect the health, safety and rights of women . . . seeking access to [medical and counseling] services.'" (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 603, 114 S.Ct. at p. 2521].) Accordingly, the trial court expanded the injunction by providing that the protesters were prohibited from entering the clinic's premises; blocking access to the clinic; congregating, picketing, patrolling, demonstrating or entering within 36 feet of the property line of the clinic, thereby effectively forcing the petitioners to the other side of Dixie Way; singing, chanting, shouting or employing sound amplification equipment or images observable to or within earshot of patients during business hours; approaching physically within 300 feet of the clinic any person seeking the services of the clinic unless such person indicated a desire to communicate by approaching or by inquiring of the petitioners; and physically abusing, intimidating, harassing, crowding or assaulting patients, owners or staff of the clinic. (*Id.* at pp. __ [129 L.Ed.2d at pp. 603-605, 114 S.Ct. at pp. 2521-2522].) The injunction also included restrictions on similar activities within 300 feet of the residence of any owner, staff member, or employee of the clinic. (*Ibid.*)

The Supreme Court of Florida upheld all portions of the expanded injunction against a free speech challenge. (*Operation Rescue* v. *Women's Health Center, supra,* 626 So.2d at pp. 675-676.)

After granting certiorari (510 U.S. __ [127 L.Ed.2d 98, 114 S.Ct. 907]), the United States Supreme Court upheld certain provisions of the injunction

and struck down others. First, the high court determined that the injunction was content neutral, rejecting the petitioners' assertion that because it restricted only the activities of anti-abortion protesters, the injunction was necessarily content based. As the court explained, an injunction "by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. . . . [¶] The fact that the injunction in the present case did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion . . . There is no suggestion in this record that Florida law would not equally restrain similar conduct directed at a target having nothing to do with abortion; none of the restrictions imposed by the court were directed at the contents of petitioners' message." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 606, 114 S.Ct. at p. 2523].)

The high court then observed that if the underlying action had involved a generally applicable statute, instead of an injunction, it would proceed to assess its constitutionality under the standard set forth *Ward* v. *Rock Against Racism, supra,* 491 U.S. 781, 791 [105 L.Ed.2d 661, 675], to wit, whether the time, place and manner regulation " 'was narrowly tailored to serve a significant governmental interest.' " (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 607, 114 S.Ct. at p. 2524].) However, citing certain differences between injunctions and generally applicable statutes, the court concluded that a different standard was required. Injunctions, the court observed, "carry greater risks of censorship and discriminatory application than do general ordinances" and represent judicial remedies tailored to specific circumstances rather than "a legislative choice regarding the promotion of particular societal interests." (*Ibid.*) These differences, the *Madsen* court determined, "require a somewhat more stringent application of general First Amendment principles . . . ." (*Ibid.*) Accordingly, the court held that the test to be applied in evaluating a content neutral injunction should be "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Id.* at p. __ [129 L.Ed.2d at p. 608, 114 S.Ct. at p. 2525].)

Applying this test to the Florida clinic restrictions, the high court agreed with the Florida Supreme Court's conclusion that the state's "strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy," ensuring "safety and order," and "promoting the free flow of traffic on public streets and sidewalks" was more than sufficient to justify an appropriately tailored injunction. (512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at p. 2526].) The court then

turned to whether the specific restrictions imposed on the petitioners' activities burdened no more speech than necessary to achieve those goals.

The high court first held that the 36-foot buffer zone represented a valid means of "protecting unfettered access to and egress from the clinic, and ensuring that petitioners do not block traffic on Dixie Way." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 610, 114 S.Ct. at p. 2527].) The court found significant in this regard the fact that the protesters were involved in highly "focused" picketing "directed primarily at patients and staff of the clinic." (*Ibid.*) The court noted that it had long distinguished "between the type of focused picketing banned from the buffer zone and the type of generally disseminated communication that cannot be completely banned in public places, such as handbilling and solicitation." (*Ibid.*)

The Supreme Court also recognized that the trial court appeared to have had few other practical options "given the narrow confines around the clinic" (512 U.S. at p. __ [129 L.Ed.2d at pp. 610-611, 114 S.Ct. at p. 2527]), and noted that the trial court "was convinced that allowing the petitioners to remain on the clinic's sidewalk was not a viable option in view of the failure of the first injunction to protect access." (*Ibid.*) Although the high court acknowledged that the need for a complete buffer zone might be "debatable," it held that "some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." (*Ibid.*) The court also noted that the buffer zone was narrow enough that protesters across the street could still "be seen and heard from the clinic parking lots." (*Ibid.*) Thus, the high court concluded that the buffer zone burdened "no more speech than necessary to accomplish the governmental interest at stake." (*Ibid.*)

The *Madsen* court also upheld the limited noise restrictions around the clinic, citing the state's strong interest in maintaining a relatively tranquil environment outside a medical facility "during surgery and recovery periods." (512 U.S. at p. __ [129 L.Ed.2d at p. 612, 114 S.Ct. at p. 2528].) As the court observed, the "First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." (*Ibid.*) Thus, the court held that the restrictions burdened no more speech than necessary to "ensure the health and well-being of the patients at the clinic." (*Ibid.*)

The high court then proceeded to strike down several other provisions of the injunction, notably that portion of the 36-foot buffer zone that included certain private property abutting the clinic, and the ban on all "images

observable" to patients inside the clinic. The court concluded that neither restriction appeared necessary to protect either access to the clinic or patient health and safety. (512 U.S. at p. __ [129 L.Ed.2d at pp. 611-613, 114 S.Ct at pp. 2528-2529].) The court also found impermissible the ban on all uninvited approaches to patients within 100 yards of the clinic, observing that it was broader "than is necessary to prevent intimidation and to ensure access to the clinic." (*Id.* at p. __ [129 L.Ed.2d at p. 613, 114 S.Ct. at p. 2529].) Similarly, the high court found that the 100-yard buffer zone around the residences of clinic owners and staff was unnecessarily large, and observed that a "smaller zone could have accomplished the desired result." (*Id.* at p. __ [129 L.Ed.2d at p. 614, 114 S.Ct. at p. 2530].)

Finally, the high court summarily rejected vagueness, overbreadth, and freedom-of-association challenges to the injunction. (512 U.S. at p. __ [129 L.Ed.2d at pp. 614-615, 114 S.Ct. at p. 2530].)[1]

### III.

We turn now to the question whether the injunction that we upheld in *Planned Parenthood I, supra,* 7 Cal.4th 860, remains valid under *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516].

#### A.   *The Place Restrictions Are Content Neutral*

As to the threshold issue of content neutrality, we note that our analysis in *Planned Parenthood I, supra,* 7 Cal.4th 860, is entirely consistent with the high court's reasoning and conclusion in *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516]. There, as here, the injunction was issued in response to petitioners' *physical* harassment and intimidation of clinic patients. There, as here, the injunction was impelled solely by the petitioners' course of conduct, not by the content of their speech. Neither injunction made any reference whatsoever to petitioners' anti-abortion viewpoint. Thus, the *Madsen* court's conclusion that the buffer zone was content neutral fully comports with our like conclusion in *Planned Parenthood I, supra,* 7 Cal.4th at page 871. The petitioners' assertion that an injunction directed exclusively against a particular ideological group is necessarily content based was

[1]We note that three Justices would have found the injunction to be content based and thus would have applied a strict-scrutiny standard to determine its constitutional validity. (512 U.S. at pp. __, __ [129 L.Ed.2d at pp. 622-627, 114 S.Ct. at pp. 2537-2540] (conc. & dis. opn. of Scalia, J., joined by Kennedy and Thomas, JJ.) Another justice would have adopted a less, rather than a more, stringent standard for assessing whether an injunction survives a free speech challenge. (*Id.* at pp. __ [129 L.Ed.2d at pp. 615-616, 114 S.Ct. at pp. 2531-2534] (conc. & dis. opn. of Stevens, J.).)

rejected as spurious in each case. (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 606-607, 114 S.Ct. at p. 2524]; *Planned Parenthood I, supra,* 7 Cal.4th at p. 870.)

Petitioners also reassert the argument, raised and rejected in *Planned Parenthood I, supra,* 7 Cal.4th 860, that a buffer zone justified in part on sheltering patients from the "emotional impact" of anti-abortion speech is necessarily content based. Once again, petitioners misapprehend the basis of the place restriction at issue. The purpose of the injunction, as the trial court made plain, was to ameliorate the confrontational tactics of petitioners and to prevent the physical intimidation that resulted in higher stress and anxiety. The target was thus petitioners' *physical* tactics, not their anti-abortion message. As we explained, "a similar injunction might just as readily apply to pro-choice demonstrations or to any other disruptive protest in close physical proximity to the clinic." (*Planned Parenthood I, supra,* 7 Cal.4th at p. 871.)

B. *Significant State Interests Support a Limited Buffer Zone*

As to the nature and purpose of the place restrictions themselves, the holdings in *Planned Parenthood I, supra,* 7 Cal.4th 860, and *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], are also consistent. *Madsen* conclusively affirmed the principle which many lower courts—including our own—had previously endorsed, that a narrowly drawn "buffer zone" around a family planning clinic may be justified if it advances significant state interests. The factual parallels between *Madsen* and the case at bar are indeed striking. In both cases, petitioners engaged in highly focused picketing and sidewalk "counseling" directed to patients and staff in various areas in front of the clinic, including the sidewalk and the driveways providing access to the parking lot. (*Madsen, supra,* 512 U.S. __ [129 L.Ed.2d at pp. 603-604, 114 S. Ct. at p. 2521]; *Planned Parenthood I, supra,* 7 Cal.4th at p. 866.) In both cases, petitioners *impeded* access to the clinic and blocked traffic by marching across the driveways, causing traffic to slow so that petitioners could approach vehicles and hand literature to the occupants. (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 603-604, 114 S.Ct. at p. 2521]; *Planned Parenthood I, supra,* 7 Cal.4th at p. 866.) In both cases, petitioners physically stalked patients attempting to enter the clinic, causing higher levels of stress and anxiety. (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 603-604, 114 S.Ct. at p. 2521]; *Planned Parenthood I, supra,* 7 Cal.4th at pp. 866-867.) In both cases, evidence concerning the petitioners' activities following issuance of the original injunction led the trial court to conclude that a broader restriction was necessary to accomplish its goals.

(*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 603-604, 114 S.Ct. at p. 2521]; *Planned Parenthood I, supra,* 7 Cal.4th at pp. 866-867.) In both cases, the trial court limited the petitioners' activities to the opposite side of the street from the clinic; in *Madsen,* the buffer zone prohibited petitioners from picketing, patrolling, demonstrating or entering within 36 feet of the property line of the clinic, effectively forcing petitioners to "move to the other side of Dixie Way . . ." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at pp. 2526]); here, the buffer zone limited petitioners' protest activities to the public sidewalk on the opposite side of Broadway. (*Planned Parenthood I, supra,* 7 Cal.4th at p. 867.) Although the record provided by the parties does not disclose the precise parameters of the buffer zone thus created, we have taken judicial notice of official maps maintained by the Public Works Department of the City of Vallejo which show the distance across Broadway to be 60 feet.[2] Thus, the 2 restrictions were essentially equivalent in size and function, the disparity between 36 and 60 feet—or approximately 8 yards—representing a relatively small difference in degree, attributable solely to the differing widths of the streets in question.[3]

Thus, *Madsen* strongly supports the conclusion that the buffer zone in this case was amply justified by at least two significant governmental interests. First, as we previously held in *Planned Parenthood I, supra,* 7 Cal.4th 860, the buffer zone was necessary to ensure "safety and order" in the relatively restricted physical area surrounding the clinic, an interest expressly recognized by the high court as supportive of the place restriction in *Madsen.* (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at p. 2526].) Indeed, in upholding the corollary noise restriction imposed by the Florida trial court, the high court observed that the state has a strong interest in maintaining a relatively tranquil environment for patients "during surgery and recovery periods." (*Id.* at p. __ [129 L.Ed.2d at pp. 611-612, 114 S.Ct. at p. 2528].) The First Amendment does not, in the high court's words, "demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." (*Ibid.*)

---

[2]In accordance with Evidence Code section 459, subdivisions (c) and (d), the parties have been given notice and an opportunity to be heard on the issue of judicial notice of the map in question. We find the law to be well settled that trial or reviewing courts may properly notice government maps and surveys. (Evid. Code, §§ 452, subd. (h), 459; *Merritt* v. *Barta* (1910) 158 Cal. 377, 381 [111 P. 259]; *People* v. *Southern Pacific Co.* (1918) 177 Cal. 555, 558 [171 P. 294]; *South Shore Land Co.* v. *Petersen* (1964) 226 Cal.App.2d 725, 745 [38 Cal.Rptr. 392].)

[3]The relevant distance is the 60 feet between the sidewalk in front of the clinic and the sidewalk across the street. As the record and the trial court's findings make clear, the sidewalk in front of the clinic is the site where most of petitioners' target audience—the clinic patients and staff—had been approached as they entered and left the clinic either on foot or in their vehicles.

As the high court further recognized, a buffer zone may also be justified as a means of "protecting unfettered access to and egress from the clinic, and ensuring that petitioners do not block traffic . . . ." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 610, 114 S.Ct. at p. 2527].) Although this was not cited as a basis for upholding the injunction in *Planned Parenthood I, supra,* 7 Cal.4th 860, since the state's interest in protecting the patients' health and safety was deemed to be a sufficient interest to uphold the place restriction, the parallels with *Madsen* in this regard cannot be overlooked. There, as here, the close physical confines of the area surrounding the clinic limited the trial court's options. The evidence here disclosed that the sidewalk in front of the clinic is quite short and punctuated by two driveways, so that even one or two picketers could effectively block pedestrian or vehicular traffic. Indeed, there was evidence that the more limited preliminary injunction had not been complied with, and the trial court found that petitioners had, in fact, interfered with and obstructed entrance to and exit from the clinic. (*Planned Parenthood I, supra,* 7 Cal.4th at p. 867.) The buffer zone was thus the only practicable means of ensuring unfettered access.

In sum, therefore, we find that *Madsen* provides compelling reinforcement of our earlier conclusion that the buffer zone in this case was amply warranted by the facts and the governmental interests at stake.

Petitioners' arguments to the contrary are unpersuasive. They would have us read *Madsen* for the proposition that a limited buffer zone is permissible *only* where the record reveals that patients have been physically *prevented* from gaining access to a medical facility. Since nothing in the record here reveals that any woman was ever physically denied access, petitioners contend that *Madsen* is critically distinguishable from the case at bar, and affirmatively invalidates the instant injunction.

Petitioners misread *Madsen* in several respects. First, petitioners are incorrect in asserting that *Madsen* requires proof that patients have been denied access to medical attention. The Florida trial court in *Madsen* determined that the petitioners had significantly "interfered" with access to and egress from the clinic by means of a number of harassing tactics, and that several women had initially turned away, only to return at a later date. There was no finding, however, that any woman had been physically denied access to the clinic or medical attention. (*Operation Rescue* v. *Women's Health Center, supra,* 626 So.2d at pp. 666-669.) The United States Supreme Court held, in turn, that the 36-foot buffer zone was necessary to protect "unfettered" access to and egress from the clinic. (512 U.S. at p. __ [129 L.Ed.2d at p. 610, 114 S.Ct. at p. 2527].)

Thus, contrary to petitioners' assertion, *Madsen* does not require evidence that patients have been physically barred from obtaining medical treatment as a precondition to the establishment of a limited buffer zone. It is sufficient, as the trial court found here, that petitioners had significantly blocked driveways, surrounded patients' cars, and stalked and obstructed patients walking to and from their cars and public transportation, and had thereby significantly "interfered" with clinic access. (*Planned Parenthood I, supra*, 7 Cal.4th at p. 867.)

Nor, as petitioners urge, does *Madsen* undermine this court's conclusion in *Planned Parenthood I, supra*, 7 Cal.4th 860, that the buffer zone was justified by the state's interest in protecting the health and safety of medical patients, particularly those about to undergo surgery with all the physical and emotional strains and medical risks attendant thereto. Indeed, in upholding the noise provisions of the injunction in *Madsen*, the high court relied on the same precedents that we cited in *Planned Parenthood I, supra*, 7 Cal.4th at page 873 (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 232, 92 S.Ct. 2294]; *Beth Israel Hospital* v. *NLRB* (1978) 437 U.S. 483, 509 [57 L.Ed.2d 370, 390-391, 98 S.Ct. 2463] (conc. opn. of Blackmun, J.); *NLRB* v. *Baptist Hospital, Inc.* (1979) 442 U.S. 773 [61 L.Ed.2d 251, 99 S.Ct. 2598]) for the principle that "[t]he nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations . . . that are reasonable.' " (*Grayned* v. *City of Rockford, supra*, 408 U.S. at p. 116 [33 L.Ed.2d at p. 232], fn. omitted; *Madsen, supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 611-612, 114 S.Ct. at p. 2528].) Recognizing the "emotional strain and worry" that naturally afflict patients entering and leaving medical facilities, particularly "during surgery and recovery periods" (512 U.S. at p. __ [129 L.Ed.2d at pp. 611-612, 114 S.Ct. at p. 2528]), the *Madsen* court held that the restriction was necessary "to ensure the health and well-being of the patients at the clinic." (*Ibid.*)

The high court's reasoning applies with equal force here, where physical confrontations with protesters moments before receiving medical treatment, including surgical procedures, subjected patients to heightened stress and anxiety. The state's recognized interest in protecting the "health and well being of the patients" at the clinic (*Madsen, supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 611-612, 114 S.Ct. at p. 2528]) represents a sufficiently important interest to justify the limited buffer zone imposed by the trial court in this case.

### C. *The Buffer Zone Burdened No More Speech Than Necessary*

Finally, we consider whether the buffer zone satisfies the "somewhat more stringent" (512 U.S. at p. __ [129 L.Ed.2d at pp. 606-607, 114 S.Ct. at p.

2524]) test articulated by the high court in *Madsen*, i.e., did it "burden no more speech than necessary" to accomplish the state's interests? (*Id.* at p. ___ [129 L.Ed.2d at pp. 607-608, 114 S.Ct. at p. 2525].) We conclude, on balance, that the restriction more than meets this heightened standard.

The physical layout of the clinic and its environs included relatively short narrow sidewalks in front of the clinic, punctuated by two driveways into the clinic parking lot. The evidence established that one or two pickets could effectively block passage along the sidewalk and impede traffic. In its preliminary injunction the trial court had allowed four interspersed picketers to remain on the sidewalk in front of the clinic. However, the evidence at trial indicated that picketers had not followed the preliminary injunction and the clinic director stated that police had been called "to issue the injunction a couple of times . . . to people who were on the sidewalk and were about to break the rules, or breaking the rules." (*Planned Parenthood I, supra,* 7 Cal.4th at pp. 866-867, fn. 2.) The court also heard testimony that petitioners had physically followed and surrounded patients, interfered with clinic access, and caused heightened stress and anxiety in clinic patients.

The trial court was thus required to craft an injunction that more effectively protected the state's interests in protecting unimpeded access to the clinic and the well-being of clinic patients, while simultaneously preserving petitioners' right to communicate their message to clinic patients and staff. A less restrictive alternative had been tried and found wanting. A minimal buffer zone was clearly a reasonable and necessary means of ameliorating the confrontational tactics of petitioners. The site across the street was in plain view of persons entering and leaving the clinic and afforded petitioners a reasonable vantage from which to communicate their viewpoint without subjecting patients to physical intimidation. On balance, therefore, we hold that the buffer zone burdened no more speech than necessary to accomplish the governmental interests at stake. (*Madsen, supra,* 512 U.S. at p. ___ [129 L.Ed.2d at pp. 610-611, 114 S.Ct. at p. 2527].)

Although petitioners contend otherwise, *Madsen* fully supports this conclusion. There, as here, the trial court was confronted with a relatively restricted geographic area in front of the family planning clinic, physical harassment of patients occurring within these narrow confines, and an earlier injunction that had not proved to be successful. The high court held that, in these circumstances, a 36-foot buffer zone ensuring unimpeded access to the clinic by restricting petitioners to the opposite side of the street was amply justified. As summarized above, the facts here similarly justified a limited buffer zone to ensure patient access and prevent intimidation.

Petitioners also contend that the buffer zone cannot be upheld as necessary to preclude health-threatening physical confrontations between patients and protesters without running afoul of *Madsen*'s separate holding that the 100-yard "no approach" zone in that case was invalid. To recall, the Florida court, in addition to prohibiting protesters from entering anywhere within 36-feet of the clinic, also ordered petitioners to refrain from physically approaching any patient within 100 yards of the clinic unless such person indicated a desire to communicate. (*Madsen*, *supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 604-605, 114 S.Ct. at p. 2522].) The high court held that this "no approach zone" was overbroad, since it appeared to forbid contact within an exceptionally large geographic area without sufficient evidence of its necessity. As the high court observed, "it burdens more speech than is necessary to prevent intimidation and to ensure access to the clinic." (*Id.* at p. __ [129 L.Ed.2d at p. 613, 114 S.Ct. at p. 2529].) In contrast, the evidence here amply supported the conclusion that a buffer zone of some 60 feet, like the analogous 36-foot zone in *Madsen*, was necessary to "prevent intimidation and to ensure access to the clinic." (*Ibid.*) Nothing in *Madsen* undermines this conclusion.

Finally, our conclusion in *Planned Parenthood I*, *supra*, 7 Cal.4th at pages 880-881, that the injunction leaves petitioners adequate alternative means of reaching their target audience remains unchanged in light of *Madsen*. From their vantage across the street petitioners may convey their anti-abortion message to clinic patients and staff, without obstructing access to the clinic or physically intimidating patients in the process.[4]

CONCLUSION

The place restriction upheld by this court in *Planned Parenthood I*, *supra*, 7 Cal.4th 860, fully comports with the holding of the United States Supreme Court in *Madsen*, *supra*, 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516]. Accordingly, we reaffirm the judgment of the Court of Appeal.

Lucas, C. J., Mosk, J., Baxter, J., George, J., and Strankman, J.,* concurred.

KENNARD, J., Dissenting.—The trial court issued a sweeping permanent injunction prohibiting anti-abortion protesters from picketing on the public

---

[4]Petitioners also rely on a recent federal decision, *Pro-Choice Network* v. *Schenck* (2d Cir. 1994) 34 F.3d 130, in which the court held that the record evidence did not support imposition of a buffer zone outside a woman's health clinic. That decision has been withdrawn, however, pending rehearing in bank.

*Presiding Justice, Court of Appeal, First District, Division One, assigned by the Acting Chairperson of the Judicial Council.

sidewalk in front of a health clinic at which abortions are performed. The only issue before this court is whether the injunction improperly restricted the protesters' right of free expression, in violation of the First Amendment to the United States Constitution.

This is the second time that we have addressed the validity of the injunction. Originally, a majority of this court held the injunction to be constitutional. (*Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1994) 7 Cal.4th 860 [30 Cal.Rptr.2d 629, 873 P.2d 1224], hereafter *Planned Parenthood I.*) I disagreed. Thereafter, the United States Supreme Court granted certiorari, vacated the judgment, and directed this court to reconsider the matter in light of the high court's recent decision in *Madsen* v. *Women's Health Center, Inc.* (1994) 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516] (hereafter *Madsen*), which set forth the constitutional limitations on the power of a trial court to enjoin anti-abortion picketing in front of a clinic.

Again, a majority of this court holds that the trial court's injunction does not violate the First Amendment. Again, I dissent. In my view, the trial court's injunction violates the principles set forth in *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], in two respects.

First, *Madsen* permits the trial court to erect "buffer zones" (defined areas in which protesting or picketing is restricted or prohibited) in front of clinics at which abortions are performed *only* when "necessary to serve a significant government interest." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 608, 114 S.Ct. at p. 2525].) In this case, the trial court's broad permanent injunction was unnecessary, because previously a more narrow preliminary injunction had been effective in protecting the health and safety of the clinic's patients, in providing unimpeded public access to the clinic's facilities, and in ensuring the free flow of traffic on the street and sidewalk in front of the clinic.

Second, *Madsen* requires that injunctions creating "buffer zones" in front of clinics be couched in the narrowest terms that will accomplish the injunction's objective. (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 600-610, 114 S.Ct. at p. 2526].) But, in this case, the permanent injunction is much broader than necessary to accomplish its objective because it defines an area that is the reverse of what the United States Supreme Court meant by the term "buffer zone." A buffer zone, as I just explained, is a carefully defined and narrowly circumscribed area in which expressive conduct such as picketing or leafletting is restricted or prohibited by court order. The injunction here stands this concept on its head by defining a small area and

then decreeing that expressive activities may take place *only* in that demarcated space, thereby prohibiting such activities in an undefined and potentially infinite area outside the designated zone. An injunction in this form—walling speech *in* rather than *out*—is altogether different from the injunction involved in *Madsen.* Whether the First Amendment ever permits expressive activity to be caged and confined by such a reverse buffer zone is a novel question; certainly, such a drastic curtailment of speech cannot be constitutionally justified on the facts shown here.

The picketers in this case sought to express views that undoubtedly were disturbing or offensive to the clinic's patients and employees. But, as the United States Supreme Court has observed, to warrant First Amendment protection "the communication need not meet standards of acceptability." (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5-6, 91 S.Ct. 1575].) Thus, under our system of government we may not prohibit the dissemination of views simply because they are controversial, distasteful, or disturbing. To sanction such a prohibition "would be a complete repudiation of the philosophy of the Bill of Rights." (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 116 [87 L.Ed. 1292, 1300, 63 S.Ct. 870, 146 A.L.R. 81].)

I

Ordinarily, an appellate court's review of a trial court's factual findings is limited to determining whether the record of the trial contains substantial evidence to support them. (*Ford & Vlahos* v. *ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1235 [36 Cal.Rptr.2d 464, 885 P.2d 877]; *Peery* v. *Superior Court* (1981) 29 Cal.3d 837, 845 [176 Cal.Rptr. 533, 633 P.2d 198].) But, in reviewing a trial court's order restricting First Amendment rights, an appellate court has "a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." (*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston* (1995) __ U.S. __, __ [132 L.Ed.2d 487, 500, 115 S.Ct. 2338, 2344].) The trial court's order may be upheld only when the reviewing court concludes, after independently examining the record, that the judgment " 'does not constitute a forbidden intrusion on the field of free expression.' " (*Ibid.*, quoting *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 285 [11 L.Ed.2d 686, 709-710, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 515-516, 104 S.Ct. 1949].)

This heightened standard of review applies in this case, in which the trial court's permanent injunction bans all picketing and leafletting on the public

sidewalk in front of the clinic. Picketing and leafletting are expressive activities at the core of the First Amendment. (See, e.g., *Boos* v. *Barry* (1988) 485 U.S. 312, 318 [99 L.Ed.2d 333, 342-343, 108 S.Ct. 1157]; *United States* v. *Grace* (1983) 461 U.S. 171, 176-177 [75 L.Ed.2d 736, 742-744, 103 S.Ct. 1702].) Indeed, "handing out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression." (*McIntyre* v. *Ohio Elections Comm'n* (1995) 514 U.S. __, __ [131 L.Ed.2d 426, 440-441, 604, 115 S.Ct. 1511, 1519].) And a public sidewalk is a quintessential public forum, a place traditionally used for exchanging ideas and expressing opinions. (*Frisby* v. *Schultz* (1988) 487 U.S. 474, 480 [101 L.Ed.2d 420, 428-429, 108 S.Ct. 2495]; *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 802 [87 L.Ed.2d 567, 579-580, 105 S.Ct. 3439]; *Clark* v. *Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].)

Here, an independent review of the record can lead to only one conclusion: the trial court's permanent injunction banning *all* picketing by anti-abortion protesters on the public sidewalk in front of the clinic burdens the protesters' right of free expression substantially more than is necessary to achieve any significant government interest.

## II

Plaintiff Planned Parenthood Shasta-Diablo, Inc.'s (Planned Parenthood), clinic is located in a one-story building in the City of Vallejo. Its entrances, as well as the clinic itself, are in the rear of the building. The building is set well back from the sidewalk and the street. In front of the building is a parking area that extends around one side and behind the building. Two driveways intersect the sidewalk, providing clients and staff of the clinic with access to Broadway, a busy four-lane avenue.

On August 8, 1990, Planned Parenthood filed a complaint for injunctive relief in the Superior Court of Solano County. The complaint alleged that beginning in March 1990, defendants (Citizens for Life and its director, Christine Williams) had intimidated and harassed the clinic's staff and patients by accosting people entering and leaving the clinic's parking lot and attempting to force anti-abortion literature on them, and by obstructing the clinic's driveway. The complaint further alleged that defendants had disrupted business at the clinic through nonamplified noise and by gaining, or attempting to gain, entrance to the clinic's parking lot, grounds, walkway, and offices.

In its complaint, Planned Parenthood asked the trial court to enjoin defendants from engaging in various forms of conduct and speech. *The only*

*issue before this court, however, is the constitutionality of the ban on picketing on the public sidewalk in front of the clinic. (Planned Parenthood I, supra, 7 Cal.4th at p. 868.)* In this regard, the complaint did not seek a total ban on picketing: rather, it asked the court to restrict defendants to two pickets. In a declaration attached to the complaint, Janice Schoenfeld (an employee of Planned Parenthood) stated: "One picket could stand on one of the sidewalks, and one on the other side of the driveway in safety in order to get their message across. All people going into the clinic would have to pass their signs. Their viewpoint would be clear to passers-by on Broadway [the clinic's location]." Schoenfeld urged the court "to regulate the pickets by ordering that two only, no children, may stand on the public sidewalk." A second declaration, by Karen Ryer (an attorney representing Planned Parenthood), contained a similar request: "There are two sections of sidewalk in front of the building, ideal for pickets. However, the sidewalks are small, and only one picket could occupy each section. Otherwise, they could risk being hit by cars turning into the parking lot from a very busy Broadway Avenue."

On August 8, 1990, the day on which Planned Parenthood filed its complaint, the trial court issued a temporary restraining order pending consideration of preliminary and permanent injunctions. The order, prepared for the trial court's signature by Planned Parenthood, permitted defendants two pickets on the public sidewalk in front of the clinic.

On September 12, 1990, the court held a hearing on Planned Parenthood's request for a preliminary injunction. Two witnesses testified at the hearing: Janice Schoenfeld, the Planned Parenthood employee whose declaration had been submitted with the complaint, and Jeanette Hammer, an anti-abortion protester.

Schoenfeld described some of the disruptive activities of the protesters, but admitted that she had never asked the police to arrest any protesters and that she had never made a citizen's arrest of any protesters. She stated that the police had come to the site once and admonished the protesters to stay on the sidewalk. She said she had no objection to picketing on the sidewalk in front of the clinic, so long as it did not involve a large number of pickets or blocking of the clinic entrance.

Anti-abortion protester Hammer testified that she had done "counseling" (which Hammer described as approaching people with literature and attempting to engage them in conversation) in the parking lot near the clinic's door. She explained why counseling should be permitted in the parking lot rather than the sidewalk.

On September 19, 1990, a week after the hearing, the trial court issued a preliminary injunction *increasing to four* the number of picketers permitted on the sidewalk in front of the clinic. (The preceding temporary restraining order had allowed only two picketers.) The court restricted "picketing and/or counseling to the public sidewalk in front of the building," and it ordered that "not more than two [of the protesters] shall be less than ten feet from any other picketer or counselor." (Diagram A, attached to this dissenting opinion, depicts the site approximately to scale and shows the restrictions imposed by the preliminary injunction.) The preliminary injunction remained in effect for the next 11 months; the record contains no evidence that defendants ever violated its terms.

On April 18, 1991, Planned Parenthood's application for a permanent injunction was tried to the court. The trial lasted less than four hours and included the testimony of just three witnesses, all called by Planned Parenthood.

Planned Parenthood's first witness was Janice Schoenfeld, the Planned Parenthood employee who had testified at the hearing on the preliminary injunction. Most of her testimony concerned events occurring before the trial court issued its preliminary injunction. With respect to events occurring *after* the issuance of the preliminary injunction, the record shows only the following exchange:

"Q. [by counsel for Planned Parenthood]: Have you observed picket activity since the injunction?

"A. [by Schoenfeld]: Yes, but they followed the injunction usually, except for picketers.

"[Counsel for Planned Parenthood]: Thank you. I have nothing further. Thank you.

"The Court: You say they followed the injunction?

"The Witness: They followed the injunction, yes since the injunction."

The second witness at the trial was Marsha Anderson, the clinic's director. Her testimony was devoted exclusively to the behavior of the protesters before the trial court's preliminary injunction, with the possible exception of one statement that may have concerned activities occurring after the injunction was issued: "I called the police to issue the injunction a couple of times, to hand it out to people who were on the sidewalk and were about to break the rules, or breaking the rules."

The third and final witness at the trial was defendant Christine Williams, the director of defendant Citizens for Life. She testified that Planned Parenthood had called the police in August 1990, when the trial court's temporary restraining order was in effect, but that since the issuance of the preliminary injunction the picketing by the abortion protesters had been lawful.

On August 1, 1991—*four months after the trial on Planned Parenthood's request for a permanent injunction and eleven months after issuance of the preliminary injunction*—the trial court issued a permanent injunction. Even though Planned Parenthood had never asked the trial court to completely prohibit picketing on the sidewalk in front of the clinic, the court ordered that "[a]ll picketing, demonstrating, or counseling at the PLANNED PARENT- HOOD building shall *only* take place along the public sidewalk *across the street* from PLANNED PARENTHOOD building." (Italics added; attached as diagram B to my dissent is a drawing of the site approximately to scale showing the extent of the restrictions imposed by the permanent injunction.)

### III

The First Amendment to the federal Constitution prohibits government action abridging freedom of speech and assembly. The right to freely express one's beliefs or ideas, unpopular as they may be, is essential to "nearly every other form of freedom." (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 327 [82 L.Ed. 288, 293, 58 S.Ct. 149].) "Full and free discussion has indeed been the first article of our faith. We have founded our political system on it." (*Dennis* v. *United States* (1951) 341 U.S. 494, 584 [95 L.Ed. 1137, 1191, 71 S.Ct. 857].) Our nation's historic vigilance against attempts to curtail the expression of speech "has been the one single outstanding tenet that has made our institutions the symbol of freedom and equality" (*id.* at p. 585 [95 L.Ed. at p. 1191]) and "sets us apart from totalitarian regimes" (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134-1135, 69 S.Ct. 894]).

Picketing is a time-honored method of protest and persuasion, uniquely suited to conveying targeted, site-specific messages that gain their force from the location and context in which they are displayed. Understandably, it is rarely welcomed by the person or business at which it is directed. Those targeted by picketing have often sought to invoke the broad injunctive powers of the judiciary to prohibit picketers from expressing their views, generally contending that picketing is likely to lead to violence or disruption. Although courts may restrict picketing upon proof that the picketers or their supporters have engaged in repeated acts of violence, intimidation, or phys- ical obstruction, restriction on free speech cannot be justified by speculative

predictions of future violence or claims of past violence not supported by substantial evidence. (See *United Farmworkers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 911-912 [122 Cal.Rptr. 877, 537 P.2d 1237].) Yet there have been times in our history when courts, purportedly acting to avert violent or illegal conduct, have misused their injunctive powers to prohibit even peaceful and orderly picketing by those expressing certain views, as the following discussion illustrates.

The early part of the 20th century saw the burgeoning unionization of America's labor force. With it came industrial conflict. As workers began striking for better working conditions and higher wages, they encountered fierce opposition from employers who were determined to crush the strikes. The employers turned to the courts, which, receptive to the employers' position, resorted to their broad injunctive powers to prohibit picketing by the strikers. For example, in *Otis Steel Co.* v. *Local Union No. 218* (C.C.N.D.Ohio 1901) 110 Fed. 698, 700, the court held that picketing by a striking union could be enjoined, regardless of whether it had been accompanied by violence, because picketing "in its nature leads to disturbance, and has a tendency to intimidate." Similarly, the court in *Atchison, T. & S. F. Ry. Co.* v. *Gee* (C.C.S.D.Iowa, 1905) 139 Fed. 582, 584, explaining why the court's injunctive powers could be used to prohibit picketing by striking workers, stated: "There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity . . . . When men want to converse or persuade, they do not organize a picket line." (See also, *Amer. Foundries* v. *Tri-City Council* (1921) 257 U.S. 184, 205 [66 L.Ed. 189, 198, 42 S.Ct. 72, 27 A.L.R. 360] [pointing out that "[t]he name 'picket' indicated a militant purpose, inconsistent with peaceable persuasion."].) Judicial abuse of the injunction became so widespread that both the Democratic and the Republican parties spoke out against it, and proposed "the correction of abuses due to judicial intervention in labor conflicts." (Frankfurter & Greene, The Labor Injunction (1930), p. 1.)

No doubt aware of this background, the high court in *Madsen, supra,* 512 U.S. at page ___ [129 L.Ed.2d at pages 606-607, 114 S.Ct. at page 2524], recognized that the broad injunctive powers of the courts are fraught with the "risks of censorship and discriminatory application." Because of these risks, a reviewing court considering whether an injunction has violated the First Amendment must apply a more stringent test than the standard used to evaluate the constitutionality of content-neutral statutes regulating the time, place, and manner of expression. (*Madsen, supra,* at p. ___ [129 L.Ed.2d at

pp. 606-607, 114 S.Ct. at p. 2524].)[1] Thus, the pertinent inquiry is whether "the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Id.* at p. ___ [129 L.Ed.2d at pp. 607-608, 114 S.Ct. at p. 2525].) This standard, the court explained, "requires that an injunction be 'couched in the narrowest terms that will accomplish the pin-pointed objective' of the injunction." (*Id.* at p. ___ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at p. 2526], quoting *Carroll* v. *President and Comm'rs of Princess Anne* (1968) 393 U.S. 175, 183 [21 L.Ed.2d 325, 332-333, 89 S.Ct. 347].) In this case, the permanent injunction fails that test.

In *Madsen*, the trial court issued the injunction only *after a prior less restrictive injunction had failed*, a fact that figured prominently in the high court's decision. (*Madsen, supra*, 512 U.S. at pp. ___, ___-___, ___ [129 L.Ed.2d at pp. 603, 607-608, 610-611, 114 S.Ct. at pp. 2521, 2523-2524, 2527].)

By contrast, here the permanent injunction's prohibition of all picketing on the public sidewalk in front of the clinic was imposed after a less restrictive injunction had *succeeded*. Shortly after issuing a temporary restraining order permitting *two* picketers on the public sidewalk in front of the clinic, the trial court issued a preliminary injunction *increasing* the permissible number of picketers to *four* on the public sidewalk in front of the clinic. Roughly a year later, the permanent injunction followed, banning all picketing on the sidewalk in front of the clinic, even though Planned Parenthood had not requested this prohibition. Why this total ban? Had the terms of the preliminary injunction been less than completely effective, Planned Parenthood could certainly have been expected to present evidence of specific problems in the 11 months that the preliminary injunction was in force. Indeed, Planned Parenthood, as the plaintiff in the action (see Evid. Code, § 500) and as the party seeking to restrict speech (see *Healy* v. *James* (1972) 408 U.S. 169, 184-185 [33 L.Ed.2d 266, 281-282, 92 S.Ct. 2338]), was required to do so, and without such a showing this crucial factual issue must be resolved against it (see Evid. Code, § 115). Yet Planned Parenthood offered no such evidence at trial.

According to the majority, the evidence at trial showed that the temporary restraining order and the preliminary injunction failed to safeguard the state's interests in "protecting unimpeded access to the clinic and the

---

[1]When evaluating the constitutionality of statutes regulating time, place, and manner, the test is whether the statute was " 'narrowly tailored to serve a significant governmental interest.' " (*Madsen, supra,* 512 U.S. at p. ___ [129 L.Ed.2d at pp. 606-607, 114 S.Ct. at p. 2524].)

well-being of clinic patients . . . ." (Maj. opn., *ante*, at p. 1024.) To support this conclusion, the majority appears to rely on just two sentences of testimony.

I first turn to the majority's statement that "the evidence at trial indicated that picketers had not followed the preliminary injunction . . . ." (Maj. opn., *ante*, at p. 1024.) The only conceivable basis for this assertion is a statement that the clinic's escort coordinator, Janice Schoenfeld, made in response to a question at trial whether she had observed picket activity following issuance of the preliminary injunction: "Yes, but they followed the injunction usually, *except for picketers*." (Italics added.) This cryptic comment does not support the majority's assertion, for three reasons. First, through a subsequent inquiry of Schoenfeld, the trial court clarified that the picketers *had* obeyed the preliminary injunction.[2] Second, even if Schoenfeld's testimony could be construed as suggesting that the picketers had not followed the injunction, her remark is simply a conclusion, unsupported by any specific facts. As such, it is not even competent evidence (see Evid. Code, § 800; *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; *Lombardo* v. *Santa Monica Young Men's Christian Assn.* (1985) 169 Cal.App.3d 529, 540 [215 Cal.Rptr. 224]; *Pond* v. *Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 289 [198 Cal.Rptr. 517]), much less evidence sufficient to warrant curtailment of the fundamental rights of freedom of speech and assembly guaranteed by the First Amendment to the federal Constitution. Third, even if the majority accurately characterized Schoenfeld's testimony, it still does not support the trial court's prohibition of any picketing on the public sidewalk in front of the clinic. When picketing "has been in general lawful," even though there may have been "infrequent illegal acts not of a serious character," a total ban of picketing is not permitted and "only the unlawful conduct will be enjoined." (*Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676, 684 [123 P.2d 20].)

The other fragment of testimony that forms the basis for the majority's conclusion that the preliminary injunction was ineffective is this statement by the clinic's director, Marsha Anderson: "I called the police to issue the injunction a couple of times, to hand it out to people who were on the sidewalk and were about to break the rules, or breaking the rules." From this, the majority concludes that Anderson "had been forced to call the police to enforce the preliminary injunction . . . ." (Maj. opn., *ante*, at p. 1013.)

---

[2]Immediately after Schoenfeld's ambiguous statement, the court inquired: "You say they followed the injunction?" Schoenfeld responded: "They followed the injunction, yes since the injunction."

But the record shows that Anderson, when she made the statement at issue, was referring to events occurring *before* the trial court issued the preliminary injunction. Counsel for Planned Parenthood began his questioning of Anderson by asking her to define her duties during March 1990 "*up to the injunction date . . . ,*" after which he requested her to "describe the incidences that you can remember that occurred during the period of picketing *before the injunction* that occurred at the clinic." (Italics added.) After Anderson had described several incidents in which the protesters had engaged in disruptive behavior, including one occasion on which the clinic had called the police, Planned Parenthood's attorney asked her if she had been forced to call the police on any other occasion. Anderson gave the statement I quoted earlier: "I called the police to issue the injunction a couple of times, to hand it out to people who were on the sidewalk and were about to break the rules, or breaking the rules." Given the context in which Anderson made this statement, it appears that she was referring to episodes occurring *before* the preliminary injunction, and that in using the term "injunction" she probably meant the temporary restraining order that preceded the preliminary injunction. It is hardly surprising that the clinic had to ask the police to issue copies of the temporary restraining order to the protesters, for the order was obtained ex parte and the protesters therefore would not have known of its terms.[3]

Even if Anderson's statement could be construed as referring to events occurring *after* issuance of the preliminary injunction, it would not support the trial court's ban of picketing on the sidewalk in front of the clinic. Anderson's testimony is devoid of any specifics that would lead her or anyone else to conclude that the protesters were "about to break the rules, or breaking the rules." Therefore, Anderson's statement, like the sentence fragment from Schoenfeld's testimony so heavily relied upon by the majority, is merely a conclusion unsupported by any facts and thus is not competent evidence, much less evidence sufficient to support the trial court's total prohibition of free speech on the public sidewalk in front of the clinic.[4]

[3]The majority states: "The court also heard testimony that petitioners had physically followed and surrounded patients, interfered with clinic access, and caused heightened stress and anxiety in clinic patients" (maj. opn., *ante*, at p. 1024), implying that this testimony described incidents occurring after the trial court issued its preliminary injunction. To the contrary, this testimony by Anderson described incidents occurring *before* the court issued its preliminary injunction.

[4]Although the majority cites no other *evidence* to support its conclusion that the preliminary injunction was ineffective, it does assert that "one or two pickets could effectively block passage along the sidewalk and impede traffic." (Maj. opn., *ante*, at p. 1024.) The record contains absolutely no support for this assertion, which I assume to be derived from the testimony of Jeanette Hammer, an anti-abortion protester. But Hammer testified that *sidewalk*

Even if the trial court had not issued a previous, less restrictive injunction that had successfully protected the state's interests, the preliminary injunction here would violate the First Amendment. As I shall explain, it is substantially broader than the injunction issued in *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], or in any other case upholding a buffer zone in front of a clinic.

In *Madsen,* the United States Supreme Court upheld a 36-foot "buffer zone" around a health clinic that performed abortions insofar as it applied to activities on the public right-of-way in front of the clinic, but the court invalidated the injunction insofar as it included property to the back and the side of the clinic. (*Madsen, supra,* 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 609-612, 114 S.Ct. at pp. 2526-2528].) Here, the trial court ordered that defendants could picket *only* in one place: the sidewalk across the street from the clinic. Thus, the court did not merely create a buffer in front of the clinic: it prohibited defendants from picketing *anywhere* except for the one location specified in the injunction. *Madsen* provides no support for this drastic curtailment of defendants' First Amendment rights.

In *Madsen,* the court held that the 36-foot buffer zone was constitutionally permissible for two reasons. First, the trial court in that case had few other options "in view of the failure of the first injunction to protect access." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 610, 114 S.Ct. at p. 2527].) Second, the characteristics of the clinic's site demonstrated that the injunction did not significantly impair the free speech rights of the protesters. On the public right-of-way, the 36-foot buffer zone put the protesters

---

*counseling* of motorists entering the parking lot, not *picketing,* could impede traffic and cause accidents if it were conducted on the sidewalk. The distinction between the two is significant. "Counseling," as Hammer defined it, requires lengthy conversations, and thus could pose a risk of traffic accidents if the subject of the counseling is a driver or passenger in a car turning from a busy street into the clinic's parking lot. Picketing, by contrast, requires no such conversations, and thus would not impede traffic or cause accidents; indeed, sidewalk picketing on busy streets by strikers and others protesting a variety of grievances is commonplace in our society. Thus, Hammer's testimony provides no support for the majority's claim that the record shows picketing to be an impractical, dangerous activity.

Even if one were to accept the majority's mischaracterization of Hammer's testimony, her testimony nonetheless would provide no support for the trial court's order enjoining all picketing from the sidewalk in front of the clinic. Hammer testified at the hearing held before issuance of the preliminary injunction; she did not, as the majority misleadingly implies (maj. opn., *ante,* at p. 1024), refer to the period after the preliminary injunction was already in effect. Thus, her testimony provides no support for the trial court's decision to impose restrictions on picketing *greater* than those contained in the preliminary injunction.

In any event, even if Hammer's testimony at the hearing on Planned Parenthood's request for a preliminary injunction could be construed as referring to picketing on the sidewalk being impractical and posing a risk of traffic accidents, the trial court rejected it, because one week after Hammer's testimony it *increased* the number of pickets permitted on the sidewalk in front of the clinic from two to four.

across a narrow, 21-foot wide street, where they were "no greater than 10 to 12 feet from cars approaching and leaving the clinic" and could "still be seen and heard from the clinic parking lots." (*Ibid.*)

Unlike the situation in *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], the permanent injunction here permits the protesters to picket only in one spot, on the opposite side of the busy four-lane avenue on which the clinic is located. That location is approximately 67 feet (the combined width of the sidewalk and Broadway Avenue) from the edge of the sidewalk in front of the building housing the clinic, 112 feet from the front of the building where the clinic is located, and approximately 172 feet from the entrance to the clinic. (See diagram B.) Thus, the injunction in this case imposes a far greater intrusion on First Amendment rights than the narrow 36-foot buffer in *Madsen.*

In upholding the permanent injunction in this case, the majority notes that *Madsen, supra,* 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], "conclusively affirmed" the principle that buffer zones around clinics may be justified. (Maj. opn., *ante,* at p. 1020.) I have two observations. First, the permanent injunction in this case did not establish a "buffer zone": it did not create an area around the clinic in which picketing was restricted and allow picketing everywhere else; instead, it limited the picketing to a specific area and prohibited picketing in all other locations. (Compare diagram A with diagram B.)

Second, although *Madsen* held that in some circumstances buffer zones are constitutionally permissible, the high court cautioned that any injunction limiting the right of free expression, including those establishing buffer zones, must be " 'couched in the narrowest terms that will accomplish the pin-pointed objective' of the injunction." (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 609, 114 S.Ct. at p. 2526].) *Madsen* itself, and all other decisions in which courts have upheld the validity of buffer zones, have limited the scope of those buffers to minimize their impact on free expression. This has been accomplished by (1) permitting a small number of protesters within the buffer zone (e.g., *Horizon Health Center* v. *Felicissimo* (1994) 135 N.J. 126 [638 A.2d 1260, 1273] ["rather than prohibiting all expressional activities on the sidewalk directly in front of the [clinic], the injunction should have allowed a limited, controlled form of expression near the entrance while restraining the troublesome mass of protesters to a location across the street"]; *Northeast Women's Center, Inc.* v. *McMonagle* (3d Cir. 1991) 939 F.2d 57, 63-64 [six picketers permitted within buffer zone]; *Fargo Women's Health* v. *Lambs of Christ* (N.D. 1992) 488 N.W.2d

401, 409 [trial court permitted two picketers; case remanded for further fact-finding on whether injunction was overbroad]); or (2) drawing the boundaries of the buffer zone so narrowly that protesters standing outside the clinic could still communicate effectively with persons entering and leaving the clinic (e.g., *Madsen, supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at pp. 2527-2528] [36-foot zone narrow enough to place protesters 10 to 12 feet from cars approaching and leaving clinic, thereby retaining protesters' ability to be seen and heard from clinic parking lots]; *Pro-Choice Network* v. *Project Rescue* (W.D.N.Y. 1992) 799 F.Supp. 1417, 1433-1434 [buffer zone extending only 15 feet from clinic entrances]; *Planned Parenthood* v. *Holy Angels Catholic Church* (N.D.Cal. 1991) 765 F.Supp. 617, 626 [clear zone of only 25 feet from clinic entrances]; *Bering* v. *Share* (1986) 106 Wn.2d 212 [721 P.2d 918, 929-931] [picketing permitted on sidewalk next to, but not in front of, medical facility]). In contrast, here the permanent injunction is not similarly limited to minimize the impact on defendants' right of free expression; rather, it prohibits *any* picketing in the entire area around the clinic, permitting picketing only in a small area *across* a busy, 4-lane avenue that is 67 feet from the edge of the public sidewalk directly in front of the clinic and approximately 172 feet from its entrance.

To summarize: (1) In *Madsen, supra*, 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], the United States Supreme Court upheld the trial court's injunction only to the extent that it barred picketing in the right-of-way immediately in front of the clinic; here, the majority approves an injunction that bans picketing *everywhere* except for a narrow, specific location far from the entrance to the clinic. (2) In *Madsen*, the failure of a prior less restrictive injunction demonstrated the need for more restrictive provisions; here, the *success* of the prior less restrictive injunction shows that more stringent restrictions are unnecessary. (3) In *Madsen*, the court permitted picketers to come within 10 to 12 feet of cars approaching and leaving the clinic; here, the protesters can exercise their First Amendment rights only on the other side of an avenue 60 feet wide, at a considerable distance from those entering or leaving the clinic. (4) In *Madsen*, "[p]rotesters standing across the narrow [21 feet wide] street from the clinic [could] still be seen and heard from the clinic parking lots" (512 U.S. at p. __ [129 L.Ed.2d at p. 611, 114 S.Ct. at p. 2527]); here, the protesters must make their voices heard over the roar of traffic on the busy four-lane avenue separating them from the clinic.

These differences demonstrate that unlike the injunction the high court upheld in *Madsen*, the permanent injunction here burdens more speech than necessary, thus violating the First Amendment guarantee of free speech.

(*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at p. 2526].)

## CONCLUSION

Everyone is in favor of free speech. We constantly extol its virtues. But to some people the idea of free speech is that they are free to say what they want but those with different views are not. (Speech to House of Commons by Sir Winston Churchill, Oct. 13, 1943, Winston S. Churchill—His Complete Speeches (James edit. 1974) vol. VII, p. 6861.) The essence of our First Amendment's guarantee of freedom of expression, however, is the right of anyone to speak out. "[F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." (*West Virginia Bd. of Ed.* v. *Barnette* (1943) 319 U.S. 624, 642 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674].) To abridge that right is to abridge liberty.

Here, anti-abortion protesters sought to picket on the public sidewalk in front of the clinic. A public sidewalk is the quintessential public forum for the exercise of First Amendment rights. The trial court granted a preliminary injunction limiting to four the number of picketers on the sidewalk. The preliminary injunction remained in effect for 11 months, a period more than sufficient to test its effectiveness in controlling abusive and obstructive conduct by the picketers. There is no evidence in this case that the preliminary injunction was not fully effective in striking a delicate balance between the constitutional right of a woman to obtain an abortion during the early months of pregnancy and the constitutional right of every person to publicly and peacefully express an opinion.

Abortion protesters are not above the law. When they engage in illegal or disruptive conduct, the judicial system should act swiftly to protect the rights of women seeking the services of any clinic at which abortions are performed. Had the picketers resorted to violence or committed serious and willful violations of the preliminary injunction, I would not for a moment hesitate to affirm an order of the trial court excluding them from the sidewalk in front of the clinic. But there is *no* evidence in the record before this court that after the trial court's issuance of a preliminary injunction that the picketing by the protesters was other than peaceful. The protesters were openly engaged in making the public aware of their strongly held belief that the performance of abortions at the clinic was morally wrong. Disturbing as the expressions of protest must have been to the clinic's staff and patients,

the very essence of the First Amendment is freedom to express ideas that others may find profoundly unsettling or offensive. All who seek to protest, no matter what their views, are equally entitled to this protection.[5]

Based on the record in this case, there simply was no need, practically or legally, to banish the picketers to the opposite side of the busy four-lane avenue, and to bar them from peacefully expressing their views on the public sidewalk directly in front of the clinic. Accordingly, the trial court's permanent injunction burdened more speech than was necessary to protect the clinic's staff and patients, and thus violated the First Amendment to the United States Constitution. (*Madsen, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 609-610, 114 S.Ct. at p. 2526].)

---

[5]One cannot help but wonder if the majority would as readily have upheld the trial court's injunction abridging the picketers' right to free speech had the picketers been striking employees of the clinic instead of anti-abortion protesters.

APPENDIX

DIAGRAM A

PRELIMINARY
INJUNCTION

= PICKETING ENJOINED

= PICKETING PERMITTED

BROADWAY

SIDEWALK
7'

<< PARKING >>

ENTRANCE

STAFF
ENTRANCE

PLANNED
PARENTHOOD

TAX
SERVICE

44'

60'

HAMPSHIRE
STREET

64'

<< PARKING >>

<< PARKING>>

184'

7'

SIDEWALK

DIAGRAM B

PERMANENT
INJUNCTION